Jeremy M. Hoffman (5290)
Scott L. Sackett II (11762)
YOUNG HOFFMAN LLC
175 South Main St. Ste 850
Salt Lake City, Utah 84111
Telephone: 801-359-1900
jmhoffman@yahlaw.com
scott@yahlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (pending application and admission pro hac vice)
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LUIS AGUILERA, derivatively on behalf of CO-DIAGNOSTICS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DWIGHT H. EGAN, REED L. BENSON, BRENT SATTERFIELD, EUGENE DURENARD, EDWARD MURPHY, JAMES NELSON, and RICHARD S. SERBIN, <br><br> Defendants, <br><br> and <br><br> CO-DIAGNOSTICS, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) BREACH OF FIDUCIARY DUTY; AND** <br> **(2) UNJUST ENRICHMENT** <br><br> <u>JURY TRIAL DEMANDED</u> |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Luis Aguilera ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Dwight H. Egan, Reed L. Benson, Brent Satterfield, Eugene Durenard, Edward Murphy, James Nelson, and Richard S. Serbin (collectively, the "Individual Defendants," and together with Co-Diagnostics, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Co-Diagnostics and unjust enrichment. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Co-Diagnostics, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Co-Diagnostics' directors and officers from February 25, 2020 through May 15, 2020 (the "Relevant Period").

2.      Co-Diagnostics is a molecular diagnostics company that develops and sells molecular tools, such as molecular diagnostic tests, for, among other things, the detection of infectious diseases.

3.      As is now a well-known fact, a novel virus and respiratory illness, designated as COVID-19, originated in China in late 2019. After beginning to rapidly sweep through the world's human population, the World Health Organization declared COVID-19 a pandemic on March 11, 2020. Shortly afterwards, on March 13, 2020, the United States declared a national emergency concerning the COVID-19 outbreak. In its swift and ongoing spread, not only has the virus resulted in millions of infections and hundreds of thousands of deaths to date, but it has also largely left the global economy and many national healthcare systems in disarray.

4.      In attempting to contain, control, and prevent the mass transmission of COVID-19, and its devastating effects, world leaders, including U.S. federal and state government officials and public health officials, have implemented extraordinary policy measures such as sheltering-in-place, quarantining, and social distancing measures. Within the United States, the development of reliable mass testing techniques for COVID-19 has heavily guided many lawmakers' strategies.

5.      For state and federal government officials, possessing accurate methods of testing for COVID-19 has become a vitally important tool for reducing the spread of the virus. Accurate tests that are readily accessible to the public provide much-needed data on where the most serious outbreaks of the virus occur, and offer insight into where medical and other resources should be

allocated, and what public policy measures are appropriate or effective.[1]

6.      In an effort to mitigate the virus' damage and to end this pandemic, U.S. officials have worked with many businesses, including life science, biotechnology, and pharmaceutical companies to develop COVID-19 tests, treatments, and vaccines. Although many corporate leaders have risen to this unique challenge, the Individual Defendants have failed to meet this moment in time with the professional aptitude, honesty, and integrity this historic undertaking requires.

7.      Early in the COVID-19 pandemic, it appeared that Co-Diagnostics was able to utilize its molecular diagnostic testing experience and know-how to quickly develop an exceptionally accurate diagnostic test for COVID-19 that simultaneously produced speedy results. As a result, Co-Diagnostics' COVID-19 test was first to an extremely competitive and time-sensitive market.

8.      Specifically, according to the Company's prospectus supplement on Form 424B5 filed with the SEC on February 28, 2020 (the "2020 Prospectus Supplement"), Co-Diagnostics announced the completion of the "principle design work" for a rapid initial screening test for COVID-19 on January 23, 2020.

9.      According to the 2020 Prospectus Supplement, on February 20, 2020, Co-Diagnostics announced that its COVID-19 test had been "submitted for registration with the

---

[1] *See generally* Rob Stein, Carmel Wroth & Alyson Hurt, *U.S. Coronavirus Testing Still Falls Short. How's Your State Doing?*, NPR (May 7, 2020, 5:00 AM), https://www.npr.org/sections/health-shots/2020/05/07/851610771/u-s-coronavirus-testing-still-falls-short-hows-your-state-doing (explaining the importance of testing for COVID-19); Rob Stein, *As Coronavirus Surges, How Much Testing Does Your State Need to Subdue the Virus?*, NPR (June 30, 2020, 5:05 AM), https://www.npr.org/sections/health-shots/2020/06/30/883703403/as-coronavirus-surges-how-much-testing-does-your-state-need-to-subdue-the-virus (explaining the importance of testing for COVID-19).

European Community" and that it was expected to be available for sale to certain European markets later that month.

10.     The 2020 Prospectus Supplement declared that Co-Diagnostics' COVID-19 test became the first in the world to obtain regulatory clearance on February 24, 2020, when it obtained the CE marking, enabling its sale in the European Community.

11.     Thereafter, as explained in the 2020 Prospectus Supplement, Co-Diagnostics began to sell its market-first COVID-19 test in late February and early March of 2020 to numerous countries and also various labs within the United States.

12.     On April 6, 2020, Co-Diagnostics announced that it had received emergency use authorization for its COVID-19 tests from the U.S. Food and Drug Administration ("FDA"). Also in April 2020, Co-Diagnostics' COVID-19 test was approved for manufacture and sale in India and Mexico.

13.     Throughout the Relevant Period, Co-Diagnostics published press releases in which the Individual Defendants explicitly claimed and continued to maintain that Co-Diagnostics' COVID-19 tests were 100% accurate—an assertion that helped the Company distinguish itself in a new but increasingly saturated market so as to establish the Company's crucial competitive advantage, as set forth in its SEC filings, over other life science companies.

14.     In mid-May 2020, news outlets reported, among other things, that Co-Diagnostics was reluctant to participate in a joint experiment designed to perform a side-by-side comparison of the quality and accuracy of various COVID-19 tests. Instead, Co-Diagnostics agreed to participate in a "condensed" version of the trial. However, the results of that abridged research

were reportedly to be kept private and out of the public sphere.

15.     On May 14, 2020, the Company's stock price plummeted from its record high of $29.72 per share as various reputable sources published reports or issued statements challenging and contradicting Co-Diagnostics' claims that its COVID-19 tests were 100% accurate. The Company's stock hit an intra-day low of $18.35 per share, a drop greater than 38%, before closing at $22.13 per share, approximately a 25.5% decrease.

16.     After markets closed on May 14, 2020, Defendant Dwight H. Egan ("Egan"), the Company's Chief Executive Officer ("CEO"), along with Defendant Reed L. Benson ("Benson"), the Company's Chief Financial Officer ("CFO") held a conference call and issued prepared remarks addressing the Company's quarterly earnings and future forecast of the Company's latest and upcoming infectious disease product offerings.

17.     Instead of correcting any false statements or omissions of material fact that had been issued in recent press releases by the Company or otherwise asserted by the Individual Defendants on behalf of the Company, Defendants Egan and Benson's remarks on the call ignored recent public reports that called into question the accuracy of the Company's COVID-19 test, notwithstanding their recognition that the product had been an integral part of the Company's revenue for the first quarter of 2020, and was to be a focal point of the Company's future business prospects.

18.     Despite the reality that the Company's COVID-19 test was not 100% accurate, the Individual Defendants failed to disclose the true accuracy of the test—and thus, its true value— while Defendant Egan and Defendant Brent Satterfield ("Satterfield"), the Company's Chief

Science Officer, affirmatively represented that the Company's COVID-19 test was 100% accurate in numerous press releases and public statements.

19.     In fact, Co-Diagnostics' COVID-19 test was materially less than 100% accurate, since even a seemingly minor inconsistency in precision can have highly significant ramifications on the usefulness of a diagnostic testing product.[2]

20.     Then, during the evening of May 14, 2020, in light of inaccurate test results related to one of Co-Diagnostics' competitors, the FDA deemed it important, "in the spirit of transparency," to issue a press release alerting the public that "[n]o diagnostic test [for COVID-19] will be 100% accurate..."

21.     As a result, on May 15, 2020, the price of the Company's stock continued to drop to an intra-day low of $15.80 per share, a nearly 47% drop from its historic high only two days prior.

22.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

23.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Co-Diagnostics, intentionally, willfully, recklessly, or with gross negligence made and/or caused the Company to make false and misleading statements and omissions. Specifically,

---

[2] As explained in greater detail below, diagnostic tests intended for widespread public use, must be decidedly exact in order to provide significant value given that an accuracy rate even marginally less than 100% can render a test futile in practice. For instance, if a diagnostics test has a 98% "sensitivity" rate (which measures how well a test identifies true positives) and a 98% "specificity" rate (which measures how well a test identifies true negatives), the upshot is that approximately one-third of the tests will yield a false positive result. Accordingly, holding diagnostic tests to a near perfect standard in clinical trials is vital to ensuring a reliable and safe product is delivered to the public.

the Individual Defendants intentionally, willfully, recklessly, or with gross negligence made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's COVID-19 tests were less than 100% accurate; (2) the commercial viability of the Company was overstated in light of the true accuracy and efficacy of the Company's COVID-19 tests; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

24.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

25.     Also in breach of their fiduciary duties owed to Co-Diagnostics, the Individual Defendants failed to maintain internal controls.

26.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its CEO, its CFO, its Chief Science Officer, and the members of its Board of Directors (the "Board"), to two federal securities fraud class action lawsuits pending in this Court (the "Securities Class Actions"), the need to undertake internal investigations, and losses due to the unjust enrichment of the Individual Defendants who benefitted from the wrongdoing alleged herein, and will likely cost the Company going forward millions of dollars.

27.     The Company has been substantially damaged as a result of the Individual Defendants' intentional, willful, highly reckless, or grossly negligent breaches of fiduciary duty

and other misconduct.

28.     In light of the foregoing breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the CEO's and the directors' liability in the Securities Class Actions and this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims based on violations of the Securities Exchange Act of 1934 (the "Exchange Act") made in the Securities Class Actions.

31.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

33.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or he or she is an individual who is a citizen of Utah or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

34.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

35.     Plaintiff is a current shareholder of Co-Diagnostics. Plaintiff has continuously held Co-Diagnostics common stock at all relevant times. Plaintiff is a citizen of Sweden.

### Nominal Defendant Co-Diagnostics

36.     Co-Diagnostics is a Utah corporation with its principal executive offices at 2401 S. Foothill Drive, Suite D, Salt Lake City, Utah 84109. Co-Diagnostics' shares trade on the NASDAQ under the ticker symbol "CODX."

### Defendant Egan

37.     Defendant Egan has served as the Company's CEO, President and Chairman since April 2013.

38.     According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), as of March 19, 2020, Defendant Egan beneficially owned

150,000 shares of the Company's common stock,[3] which represented 0.547% of the Company's outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Egan owned approximately $1,590,000 worth of Co-Diagnostics stock.

39.     For the fiscal year ended December 31, 2019, Defendant Egan received $460,000 in compensation from the Company. This included $275,000 in salary, a $20,000 bonus, and $165,000 in option awards.

40.     The Company's Schedule 14A filed with the SEC on August 9, 2019 (the "2019 Proxy Statement") stated the following about Defendant Egan:

> **Dwight H. Egan** has been an officer and director since April 2013. Mr. Egan has been engaged in private investment business from February 1999 to the present. He was a senior executive at Data Broadcasting Corporation, a leading provider of wireless, real-time financial market data, news and sophisticated fixed-income portfolio analytics to 27,000 individual and professional investors from 1995 to 1999. He co-founded and served as CEO and Chairman of the Board of Broadcast International, Inc. from 1984 to 1995, when Data Broadcasting Corporation acquired Broadcast International and created *CBS MarketWatch*, a leading financial news site and participated in its initial public offering. Mr. Egan's prior experience in directing a public company and working with capital markets gives him valuable experience in advising the board on matters of finance and operations.

41.     Upon information and belief, Defendant Egan is a citizen of Utah.

**Defendant Benson**

42.     Defendant Benson has served as the Company's CFO and Secretary since November 2014. Previously, he served as a member of the Company's Board from November

---

[3] Includes exercisable options to acquire 150,000 shares of common stock, as of March 19, 2020.

2014 until May 2017.

43.     According to the 2019 10-K, as of March 19, 2020, Defendant Benson beneficially owned 125,000 shares of the Company's common stock,[4] which represented 0.456% of the Company's outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Benson owned approximately $1.33 million worth of Co-Diagnostics stock.

44.     For the fiscal year ended December 31, 2019, Defendant Benson received $352,500 in compensation from the Company. This included $200,000 in salary, a $15,000 bonus, and $137,500 in option awards.

45.     The Company's 2019 Proxy Statement stated the following about Defendant Benson:

> **Reed L. Benson** has been Chief Financial Officer and Secretary from November 2014 to the present and a director from November 2014 to May 2017. Since September, 2008 to the present, in addition to the private practice of law, he is a founder and partner of Legends Capital Group, LLC, a privately held venture capital group that identifies investment opportunities in natural resources, bio tech and technology fields. From October 2004 to September 2008 he was employed as Chief Financial Officer, Secretary, and General Counsel and member of Board of Directors of Broadcast International, Inc., a publicly traded communications services company. From 2001 to October 2004, he was in the private practice of law where his practice focused on tax and business-related matters. From July 1995 to January 2001 he was secretary and general counsel for Data Broadcasting Corporation, a provider of market information to individual investors. Mr. Benson received his J.D. degree from the University of Utah School of Law in 1976 and a Bachelor of Science Degree in Accounting from the University of Utah in 1971. Mr. Benson became a Certified Public Accountant in 1974. Mr. Benson's experience in finance, accounting and business consulting, together with his role as

---

[4] Includes presently exercisable options to acquire 125,000 shares of common stock, as of March 19, 2020.

our CFO and prior public company directorship, provide Mr. Benson with expertise enabling critical input to our company.

46.     Upon information and belief, Defendant Benson is a citizen of Utah.

**Defendant Satterfield**

47.     Defendant Satterfield has served as the Company's Chief Science Officer[5] since April 2013. Previously, he served as a member of the Company's Board from April 2013 until April 2019.

48.     According to the 2019 Proxy Statement, as of July 30, 2019, Defendant Satterfield beneficially owned 1,359,794 shares of the Company's common stock,[6] which represented 7.9% of the Company's outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on July 30, 2019 was $1.31, Defendant Satterfield owned over $1.78 million worth of Co-Diagnostics stock.

49.     For the fiscal year ended December 31, 2019, Defendant Satterfield received $237,500 in compensation from the Company. This included $237,000 in salary.[7]

50.     The Company's 2019 Proxy Statement stated the following about Defendant Satterfield:

> **Brent Satterfield** has been our Chief Science Officer since April 2013. Dr. Satterfield has been employed by the Company from January 31, 2015 to the

---

[5] The Company's 2019 10-K also refers to Defendant Satterfield as the Company's Chief Technology Officer.

[6] According to the 2019 Proxy Statement, the shares owned by Dr. Satterfield were subject to pending litigation regarding a loan and pledge agreement with lenders.

[7] Dr. Satterfield also received royalties from the Company in the amount of $110,000 in 2019 pursuant to a technology license agreement dated April 2014 and amended in January 2017 to terminate the ongoing royalties and reduce accrued royalty payments from $30,000 per month to $10,000 per month, including in 2019.

present. Prior to that he was the sole shareholder and owner of DNA Logix, Inc. from January 2013 to January 31, 2015, and in DNA Logix he developed and patented the technology now owned by the Company. He founded Co-Diagnostics in April 2013 and is the first in his field to use engineering mathematics to design new DNA testing technology. From 2006 to 2008, he was employed by Arcxis Biotechnologies where he developed new diagnostic platforms for groups such as the Department of Homeland Security, the National Biodefense Analysis and Countermeasures Center, the United States Army Medical Research Institute of Infectious Disease, Sandia National Laboratories, the California Department of Public Health and numerous others. Under fellowship from the Department of Homeland Security, he received his Ph.D. in 2007 in Bioengineering with an emphasis in entrepreneurship and intellectual property law from Arizona State University in a dual-enrollment program with UC Berkeley. Dr. Satterfield's experience with the science underlying all of the Company's products and technology gives him valuable experience in advising the board on the status of the products and our positioning in the diagnostic testing industry.

51.     Upon information and belief, Defendant Satterfield is a citizen of Utah.

**Defendant Durenard**

52.     Defendant Dr. Eugene Durenard ("Durenard") has served as a member of the Company's Board since June 2019. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

53.     According to the 2019 10-K, as of March 19, 2020, Defendant Durenard beneficially owned 25,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Durenard owned approximately $265,000 worth of Co-Diagnostics stock.

54.     For the fiscal year ended December 31, 2019, Defendant Durenard received $45,250 in compensation from the Company. This included $27,500 in fees earned and $17,750

in option awards.

55.     The Company's 2019 Proxy Statement stated the following about Defendant Durenard:

> **Eugene Durenard** is the Founder and CEO of Hyperbolic Holdings, a Swiss-based holding, management consulting and investment advisory company specialized in healthcare since February 2018. He is co-Founder and CIO of Healthcare Impact Holdings, an investment fund specialized in later-stage healthcare private ventures since May 2018. He is co-Founder and Trustee of Healthcare Impact Foundation, a charitable organization designed to sustainably fund the translation of innovation in life sciences since September 2017. He is co-Founder of Global Better Health, a platform designed to provide scientifically-based corporate wellness and preventive programs since December 2018. He is an advisor to and Managing Director of the Stetson Family Office since September 2016. Prior to joining the Stetson Family Office, he was CIO of a NYC family office operation. In 2006 he co-founded Orion Investment Management, an institutional asset manager in Bermuda. After its sale in 2011 and until 2013 he co-headed their asset management group. Dr. Durenard brings a thorough multi-asset class investment and entrepreneurial experience spanning 20 years to the Company's Board of Directors. He received his Ph.D. in Mathematics at Harvard in 1995 before beginning his career with Salomon Brothers in London in proprietary research.

56.     Upon information and belief, Defendant Durenard is a citizen of Utah.

**Defendant Murphy**

57.     Defendant Edward Murphy ("Murphy") has served as a member of the Company's Board since June 2019. He also serves as the Chair of the Corporate Governance and Nominating Committee, and as a member of the Audit Committee and the Compensation Committee.

58.     According to the 2019 10-K, as of March 19, 2020, Defendant Murphy beneficially owned 25,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Murphy owned approximately $265,000 worth of Co-Diagnostics stock.

59.     For the fiscal year ended December 31, 2019, Defendant Murphy received $29,750 in compensation from the Company. This included $12,000 in fees earned or paid in cash and $17,750 in option awards.

60.     The Company's 2019 Proxy Statement stated the following about Defendant Murphy:

> **Edward L. Murphy,** who joined our Board of Directors in June 2019, currently serves as a senior vice president and a partner of Dover Investments Ltd., a private investment firm. Throughout his career, Mr. Murphy's duties have included investment analysis of various types of investment projects in real estate and financial services. Currently, Mr. Murphy serves on the board of directors of several Canadian publicly reporting companies that have interests in various industries. He has been a Director at Empire Minerals Corporation Inc. since January 2016, at Digicrypts Blockchain Solutions Inc. since June 2011, at Lakefield Marketing Corporation since February 2018, and at the Mosport Park Entertainment Corporation since April 30, 1997. He served as a Director at Aurquest Resources from May 2003 to December 2017. Mr. Murphy's experience in the capital markets outside the United States and his involvement in investment analysis shall be a benefit to the Board of Directors.

61.     Upon information and belief, Defendant Murphy is a citizen of Utah.

**Defendant Nelson**

62.     Defendant James Nelson ("Nelson") has served as a member of the Company's Board since August 2019.

63.     According to the 2019 10-K, as of March 19, 2020, Defendant Nelson beneficially owned 25,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Nelson owned approximately $265,000 worth of Co-Diagnostics stock.

64.     According to the Company's 2019 10-K, for the fiscal year ended December 31,

2019, Defendant Nelson received $45,833 in compensation from the Company. This included $18,333 in fees earned and $27,500 in option awards.

65.    The Company's 2019 10-K stated the following about Defendant Nelson:

**James Nelson** is the retired Chairman and CEO of Sunworks, Inc., a NASDAQ traded commercial, agriculture, and residential solar Integrator which he helped found in October 2010. Mr. Nelson currently serves as strategic advisor to three other publicly traded companies. Jim has spent most of his career working in private equity as a general partner with Peterson Partners and with Millennial Capital Partners. In addition to his investment and financial responsibilities, he served as CEO of two of his firms' portfolio companies. Prior to his years in private equity, Mr. Nelson served as Vice President of Marketing at Banana Republic, where he managed company-wide marketing, as well as the company's international expansion initiative. He was also general manager for Banana Republic's catalog division. He was Vice President of Marketing and Corporate Development at Saga Corporation, a multi-billion-dollar food service company. Jim began his executive career over 35 years ago at Bain and Company, a business strategy consulting firm, where he managed teams of consultants on four continents. Mr. Nelson received his MBA from Brigham Young University, where he graduated summa cum laude and was named the Outstanding Master of Business Administration Graduate. Mr. Nelson's advice to the Board of Directors from his experiences as a chief executive officer and strategic advisor shall be useful to the Board of Directors.

66.    Upon information and belief, Defendant Nelson is a citizen of Utah.

**Defendant Serbin**

67.    Defendant Richard S. Serbin ("Serbin") has served as a member of the Company's Board since May 2017. He also serves as the Chair of the Compensation Committee, and as a member of the Audit Committee and the Corporate Governance and Nominating Committee.

68.    According to the 2019 10-K, as of March 19, 2020, Defendant Serbin beneficially owned 45,455 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Serbin

owned approximately $481,823 worth of Co-Diagnostics stock.

69.     For the fiscal year ended December 31, 2019, Defendant Serbin received $72,750 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $17,750 in option awards.

70.     The Company's 2019 Proxy Statement stated the following about Defendant Serbin:

> **Richard S. Serbin,** who joined our Board of Directors in May 2017, currently serves as a consultant to many companies in the healthcare industry. He was the President of Corporate Development and In-House Legal Counsel at Life Science Institute, LLC, from June 1, 2013 to July 15, 2014. Mr. Serbin is a global strategy advisor, pharmacist and entrepreneur with credentials both in pharmacy and law, complemented by more than 40 years of service as an FDA regulatory attorney and patent attorney in the healthcare industry. He was appointed to the Advisory Board of Cure Pharmaceutical in January 2017 and has been a Member of Advisory Board at Prime Access, Inc. since September 2015. Mr. Serbin has been a Director at Rapid Nutrition Plc since November 18, 2014. He served as Director at Viropro Inc. from May 2013 to June 2014. He was Head of Business Advisory Board at Mazal Plant Pharmaceuticals Inc. from October 2006 to September 2007 and also served as its Member of Business Advisory Board. He served as Chief Executive Officer of Optigenex Inc. from July 2002 to September 15, 2005 and a director from July 2004 to September 2005. From January 1999 until July 2002 Mr. Serbin served as a consultant to various pharmaceutical companies. He served as the President of Bradley Pharmaceuticals. He served as Vice President of Corporate Development at Ortho Pharmaceuticals, a Johnson & Johnson subsidiary, and practiced Patent and FDA law at Revlon Johnson & Johnson and Schering-Plough. He served as Patent Attorney for Schering Plough Corporation and Chief FDA Counsel for Revlon Corporation and Johnson and Johnson Corporation. Subsequently, he worked at Revlon Corporation, as its Chief Food, Drug and Cosmetic Counsel. He founded Radius Scientific Corporation. He was J&J's Vice President of Corporate Development, and later led a successful public offering venture based on technology developed at Stanford Medical School. Mr. Serbin spent a large portion of his career focusing on international markets and clients. While at J&J, Mr. Serbin served on the Board of Directors of 16 US and international subsidiary companies, including Ethicon, Ortho, J&J Consumer Products, Pittman-Moore, Mc Neil, and J&J Development Corporation. He worked on multiple international acquisitions

and strategic relationships, and sat on the Board of Directors of several of its international subsidiaries, including those in India, Hong Kong, Japan, Taiwan, Germany, and England. Mr. Serbin has a B.S. and a B. Pharmacy from Rutgers University and Rutgers University College of Pharmacy, a J.D. degree from Seton Hall Law School and a Masters Degree in Trade Regulations and Law from NYU Law School. Mr. Serbin's experience in business, law and medicine and knowledge gained as an advisor to the healthcare industry will be critical to our Board of Directors as it commercializes its products.

71.     Upon information and belief, Defendant Serbin is a citizen of Utah.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

72.     By reason of their positions as officers and/or directors of Co-Diagnostics and because of their ability to control the business and corporate affairs of Co-Diagnostics, the Individual Defendants owed Co-Diagnostics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Co-Diagnostics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Co-Diagnostics and its shareholders so as to benefit all shareholders equally.

73.     Each director and officer of the Company owes to Co-Diagnostics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Co-Diagnostics, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers and directors of Co-Diagnostics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Co-Diagnostics, the absence of good faith on their part, an intentional or reckless disregard, or a carelessness that showed utter indifference for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Co-Diagnostics' Board at all relevant times.

77.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.   To discharge their duties, the officers and directors of Co-Diagnostics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Co-Diagnostics were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Utah, and the United States, and pursuant to Co-Diagnostics' own Code of Ethics for Senior Financial Officers (the "Code of Ethics");

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how Co-Diagnostics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Co-Diagnostics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation

to be made of, said reports and records;

   (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Co-Diagnostics' operations would comply with all applicable laws and Co-Diagnostics' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

   (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

   (g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

   (h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

 79. Each of the Individual Defendants further owed to Co-Diagnostics and the shareholders the duty of loyalty requiring that each favor Co-Diagnostics' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

 80. At all times relevant hereto, the Individual Defendants were the agents of each other and of Co-Diagnostics and were at all times acting within the course and scope of such agency.

 81. Because of their advisory, executive, managerial, and directorial positions with Co-

Diagnostics, each of the Individual Defendants had access to adverse, non-public information about the Company.

82.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Co-Diagnostics.

## CO-DIAGNOSTICS' CODE OF ETHICS

83.     The 2019 Proxy Statement states, in relevant part:

We have a Code of Ethics as defined in Item 406 of Regulation S-K, which code applies to all of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. **All directors, officers, and other employees are expected to be familiar with the Code of Ethics and to adhere to the principles and procedures set forth therein.** The Code of Ethics forms the foundation of a comprehensive program that requires compliance with all corporate policies and procedures and seeks to foster an open relationship among colleagues that contributes to good business conduct and an abiding belief in the integrity of our employees. Our policies and procedures cover all areas of professional conduct, including employment policies, conflicts of interest, intellectual property, and the protection of confidential information, as well as strict adherence to all laws and regulations applicable to the conduct of our business.

**Directors, officers, and other employees are required to report any conduct that they believe in good faith to be an actual or apparent violation of the Code of Ethics.** The full text of the Code of Ethics is available on our website. We intend to satisfy the disclosure requirements of Form 8-K regarding any amendment to, or a waiver from, any provision of our Code of Ethics by posting such amendment or waiver on our website.

(Emphasis added.)

84.     Pursuant to the Company's Code of Ethics:

The Company vests Senior Financial Officers with both the responsibility and

authority to protect, balance, and preserve the interests of all persons involved with the Corporation, including but not limited to shareholders, customers, employees, and suppliers."

85.    The Code of Ethics defines Senior Financial Officers as "chief executive officer, principal financial officer, controller or principal accounting officer, and persons who perform similar functions."

86.    The Code of Ethics provides, as to "Honest and Ethical Conduct," in relevant part, that:

> Senior Financial Officers will exhibit and promote the highest standards of honesty and ethical conduct through the establishment and operation of policies and procedures that:
>
> - Demonstrate their personal support for such policies and procedures through periodic communication reinforcing these ethical standards throughout the finance department.

87.    Moreover, the Code of Ethics states, in relevant part:

> - ...Members of the finance department, including Senior Financial Officers, are under a continuing obligation to disclose any situation that presents the possibility of a conflict or disparity of interest between the member and the Corporation. Disclosure of any potential conflict is the key to remaining in full compliance with this Code of Ethics.

88.    The Code of Ethics provides, as to "Compliance with Applicable Laws, Rules and Regulations," in relevant part, that:

> Senior Financial Officers will establish and maintain mechanisms to:
>
> - Educate members of the finance department about any federal, state or local statute, regulation or administrative procedure that affects the operation of the finance department and the Corporation generally, including but not limited to prohibitions against insider trading.
> - Monitor the compliance of the finance department with any applicable federal, state

or local statute, regulation or administrative rule.

- Identify, report, and correct in a swift and certain manner any detected deviation from applicable federal, state or local statute or regulation.

- **Ensure that disclosure in documents filed with the Securities and Exchange Commission and in other public communications is full, fair, accurate, timely, and understandable**.

(Emphasis added.)

89.    The Code of Ethics provides, as to a "Financial Records and Periodic Reports," in

relevant part, that:

Senior Financial Officers will establish and manage the Corporation's transaction and reporting systems and procedures to ensure that:

- Periodic financial communications and reports will be delivered in a manner that facilitates the highest degree of clarity of content and meaning so that readers and users will quickly and accurately determine their significance and consequence.

90.    The Code of Ethics mandates, in relevant part, that:

Persons subject to disciplinary measures shall include, in addition to the violator, others involved in the wrongdoing such as (i) **persons who fail to use reasonable care to detect a violation**, (ii) persons who if requested to divulge information withhold material information regarding a violation, and (iii) supervisors who approve or condone the violations or attempt to retaliate against employees or agents for reporting violations or violators.

(Emphasis added.)

91.    In violation of the Code of Ethics, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

Moreover, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws

and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

92.     Co-Diagnostics is a Utah-based molecular diagnostics company that was formed to utilize technology invented by Biomedical Engineering Ph.D. Defendant Satterfield to develop and market molecular tools, such as molecular diagnostic tests, for, among other things, the detection of infectious diseases.

93.     On April 28, 2017, Co-Diagnostics filed a Registration Statement on Form S-1 with the SEC, which included a preliminary prospectus (the "2017 Preliminary Prospectus") that disclosed that the Company owned and controlled proprietary technology and a portfolio of intellectual property that allowed it to engineer DNA diagnostic testing at low costs.

94.     The 2017 Preliminary Prospectus stated that as of 2017, Co-Diagnostics' primary business was the design and sale of diagnostic tests for Zika Virus, Tuberculosis, Hepatitis B, Hepatitis C, Malaria, Dengue Fever, and HIV to customers primarily located in the Caribbean, India, North America, South America, and Central America. However, according to the 2017 Preliminary Prospectus, as of 2017, Co-Diagnostics did not earn significant revenue and did not expect to earn significant revenue in the near future.

95.     The Company disclosed that it expected to obtain regulatory approval to sell tests for Tuberculosis, Hepatitis B, and Hepatitis C in the European Community sometime between 2018 and 2019. However, the 2017 Preliminary Prospectus conceded that the Company did not

anticipate offering its tests in the United States in the near future, and that beyond 2019, the Company did not have a strategy for further research and development. Instead, the Company foresaw its offering diagnostic tests within the United States "based on need and regulatory barriers."

96.     On July 12, 2017, the Company issued a press release announcing the details of its initial public offering. According to the press release, the Company offered 1,178,532 shares[8] of common stock and had been listed on the NASDAQ under ticker symbol "CODX." The Company's shares of common stock had been initially priced at $6.00 per share. Total gross proceeds from the offering equaled $7,071,192.

97.     Thereafter, the price of the Company's stock gradually decreased until it became a "penny stock" beginning in mid-April 2019, at which time Co-Diagnostics' stock intermittently traded at less than $1.00 per share for prolonged intervals until mid-January 2020. For example, on June 24, 2019, the Company's stock closed at $0.71 per share; on November 15, 2019, the Company's stock closed at $0.88 per share; and on January 9, 2020, the Company's stock closed at $0.92 per share.

98.     During this period, Co-Diagnostics was in danger of being delisted from the NASDAQ, as the NASDAQ's continued listing requirements mandate that a company's share price remain equal to or greater than $1.00 per share.

99.     In late 2019, the novel coronavirus, COVID-19, began spreading through Wuhan,

---

[8] The underwriters had a 45-day option to purchase up to 176,780 additional shares of common stock from Co-Diagnostics.

China. COVID-19's rampant spread quickly turned into a worldwide pandemic that, to date, has resulted in millions of infections, hundreds of thousands of deaths, and devastated the global economy and many national healthcare systems.

100.   Accurate and reliable methods for mass testing for COVID-19 have become a vitally important tool for containing the outbreak of the virus, as they provide much-needed data to public officials to help determine what public policy measures should be implemented.

101.   Given that fast, dependable and precise diagnostic testing is in extraordinary demand and that DNA-based testing detects COVID-19, Co-Diagnostics was in the fortuitous position to utilize its proprietary technology, intellectual property, and extensive experience in the diagnostic testing space to take advantage of this global public health crisis and financially benefit from the outbreak of the virus.

102.   Specifically, Co-Diagnostics developed its COVID-19 test using CoPrimer, which is described on the Company's website as a "leading-edge, patented platform technology" developed by Defendant Satterfield prior to the pandemic that "dramatically enhances the output of molecular diagnostic tests conducted via real-time polymerase chain reaction ('PCR') tests." According to reports, the Company designed its COVID-19 diagnostics test in only about one week.

103.   Despite facing intense competition from a number of life science companies, many of which have substantially greater financial resources and a larger workforce than Co-Diagnostics, on February 24, 2020, the Company announced that it had obtained the CE marking; i.e., regulatory approval to sell its COVID-19 tests in the European Community, before any other

U.S. company.

104.    On this news, the Company's stock began to surge in value. In the days leading up to the Company's February 24, 2020 announcement, the Company's stock traded around $3.00 per share. By February 27, 2020, the Company's stock traded as high as $19.00 per share.

105.    On February 27, 2020, the Company filed a Form 8-K with the SEC in connection with the sale and issuance of up to 470,000 shares of the Company's common stock.

106.    The Company also issued a press release on February 27, 2020 announcing a public offering of shares of common stock. With respect to proceeds of the sale, the press release asserted that:

> Co-Diagnostics intends to use the net proceeds from this offering for acquisition of PCR (polymerase chain reaction) equipment and raw materials to be used in connection with sale of tests used to diagnose infectious disease, including strains and mutations of coronavirus, as well as research and development costs associated with test development for additional pathogens and test menu expansion, and for working capital and other general corporate purposes.

107.    On March 2, 2020, the Company issued a press release announcing the closing of its previously announced registered direct offering of 470,000 shares of its common stock.

108.    On March 3, 2020, the Company issued a press release announcing that it had been invited to participate in the 27th Annual Molecular Medicine Tri-Conference. The press release quoted Defendant Egan, who stated, "[i]n the space of about a month, our CoPrimer technology allowed us to design, develop, receive regulatory approval for, and begin marketing detection tools to aid in stemming the tide of this fast-spreading disease."

109.    On or about April 3, 2020, according to an FDA press release,[9] the FDA granted Co-Diagnostics an Emergency Use Authorization for emergency use of its COVID-19 diagnostics tests by certified clinical laboratories in the U.S. for the diagnosis of COVID-19.

110.    Also on April 3, 2020, BioCentury published the results of a study analyzing the limit of detection on COVID-19 diagnostics tests produced by various companies.

111.    According to BioCentury, as of April 3, 2020, Co-Diagnostics' test had a higher limit of detection than sixteen competitor tests that were evaluated using the same criteria and only five competitor tests came in below Co-Diagnostics in that category.

112.    According to the Company's SEC filings and press releases as well as public reports, Co-Diagnostics began selling COVID-19 tests to fifty countries and more than twelve states in the U.S. almost immediately after obtaining regulatory certifications. Co-Diagnostics generated millions of dollars in revenue from the sale of its COVID-19 test kits.

113.     For example, through Nomi Health, a Utah-based health care software and data company—which has functioned much like a general contractor in these transactions—Co-Diagnostics entered into a contract worth approximately $5 million to provide COVID-19 tests from March 31, 2020 through May 30, 2020 to the state of Utah. Additionally, through Nomi Health, Co-Diagnostics entered into a contract valued at approximately $26 million to provide approximately 540,000 tests to the state of Iowa over a one-year span ending April 16, 2021.

114.    On May 1, 2020, the Company issued a press release—described in more detail

_____

[9] As noted herein, the Company issued a press release regarding its Emergency Use Authorization on April 6, 2020.

below—in which the Individual Defendants claimed that the Company's COVID-19 tests were "100%" accurate. Later that same day, Investor's Business Daily published an article entitled "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate." The article explained that, as of May 1, 2020, Co-Diagnostics stock earned a "best-possible Relative Strength Rating of 99" for its 12-month performance. Moreover, the article pointed out that the Company's stock price closed up 18.8% for the day following the Company's press release.

115.   On May 11, 2020, InvestorPlace published a news report titled "Co-Diagnostics Is a Smart Way to Play Coronavirus Testing." According to the news report, Co-Diagnostics was one of nearly four dozen companies to receive emergency use authorization from the FDA in the United States' attempt to immediately buildup its testing capacity.

116.   Notably, the article cited to Co-Diagnostics' May 1, 2020 press release, and stated, "[h]ow confident can you really be in betting on Co-Diagnostic's [sic] tests? Well, according to the company, you can take it to the bank."

117.   The article concluded by stating "Co-Diagnostics has an 'A' ranking in my Portfolio Grader right now."

118.   On May 14, 2020, the Company filed a Form 10-Q with the SEC (the "May 14 10-Q"), which indicated that sales of the Company's COVID-19 tests comprised a substantial portion of the Company's revenues for the fiscal quarter ended March 31, 2020, stating the following:

> For the three months ended March 31, 2020 we generated $1,548,528 of revenues compared to revenues of $3,400 in the three months ended March 31, 2019. **The revenue in 2020 primarily represented sales of our Logix Smart COVID-19 test, which primarily commenced in March 2020**.

(Emphasis added.)

119.    On June 13, 2020, The New Yorker published an article entitled "How Utah's Tech Industry Tried to Disrupt Coronavirus Testing" in which it explained that "sensitivity," "specificity," and the "limit of detection" are all analytic measures of a diagnostic test's performance.

120.    According to the article, sensitivity "measures how well a test picks up true positives" and specificity "measures how well a test identifies true negatives."

121.    Regarding the limit of detection, the New Yorker article explained, in relevant part, that:

> The limit of detection, or L.O.D., describes the concentration of a target pathogen that must be present for a test to consistently return a positive result. A test with a high L.O.D. may detect people who are acutely ill, when they are carrying a high viral load, but struggle to identify patients who are at the beginning or end of their illness, when the viral load is lower. Steven Hinrichs, the former director of the Nebraska Public Health Laboratory [stated] that, for a disease like COVID-19, which appears to do much of its spreading while people are presymptomatic, it is important to have tests that can identify people in the early stages of infection, so that people can be isolated and their contracts traced.

122.    In light of, among other things, the pressure to maintain the Company's NASDAQ listing and its competitive advantage over sophisticated competitors, the Individual Defendants rushed the Company's COVID-19 diagnostic tests to market without first competently verifying the accuracy of the tests.

123.    The Individual Defendants knew Co-Diagnostics' tests were less than 100% accurate and knew that the accuracy of the tests had not yet been substantiated at the time the Individual Defendants issued their false claims that the Company's tests were 100% accurate.

Additionally, the Individual Defendants knew that a diagnostic test generating accuracy rates between 95% and 99%, for example, would offer significantly less value to public officials working to quickly contain the virus and its devastating effects, as opposed to a diagnostic test with flawless precision—as explained herein.

124.    Yet, the Individual Defendants knowingly circulated false statements and omissions of material fact regarding the accuracy of the Company's COVID-19 diagnostic test to the public in order to gain a competitive advantage over other formidable biotechnology companies and to capitalize on the inimitable financial opportunity presented by the pandemic. Moreover, the Individual Defendants have since failed to correct or clarify their false and misleading statements and omissions of material fact.

### **False and Misleading Statements**

#### *March 2, 2020 Press Release*

125.    On March 2, 2020, the Company issued a press release announcing that the Company's test kits had been made available to laboratories certified under the Clinical Laboratory Improvement Amendments for use according to recently changed FDA guidelines. Defendant Egan commented, in relevant part:

> Co-Diagnostics' patented CoPrimer™ technology has been vetted in numerous applications by some of the most highly-respected firms focusing on molecular technology, and we are pleased to make this platform available domestically immediately to support the FDA's mission to slow the spread of this disease and mitigate its impact.

#### *March 12, 2020 Press Release*

126.    On March 12, 2020, the Company issued a press release announcing that Defendant

Satterfield would address a meeting held by the Bipartisan Commission on Biodefense on March 18, 2020. Defendant Satterfield commented, in relevant part, "Our current test detects COVID-19 with a high level of specificity to distinguish it from similar viruses."

### March 20, 2020 Press Release

127.    On March 20, 2020, the Company issued a press release announcing that the Company will begin fulfilling orders from a wider array of U.S. customers after a recent successful clinical evaluation of its COVID-19 test. The press release stated, in relevant part:

> Co-Diagnostics' COVID-19 polymerase chain reaction (PCR) test can yield results in under two hours, and successfully passed the clinical evaluation as requested in the policy change, **showing sensitivity of 100% and specificity of 100% in detecting SARS-CoV-2**, the virus which causes COVID-19, without demonstrating any cross-reactivity with other coronaviruses.

(Emphasis added.)

### Salt Lake Tribune Article #1

128.    On April 30, 2020, The Salt Lake Tribune ("Tribune") published an article entitled "'This is a Potential Public Health Disaster:' COVID-19 results from TestUtah.com are raising questions," which questioned the accuracy of Co-Diagnostics' tests being used at sites run by TestUtah.com, a public-private partnership aimed at gathering data on COVID-19 and providing access to free testing throughout Utah.

129.    Despite the fact that Co-Diagnostics' tests were showing that only about 2% of those with symptoms tested were positive, versus 5% positive rates for Utahns who were tested with other diagnostic equipment, Defendant Satterfield explained the alleged inaccuracies were

the result of "population differences."[10]

130.    Defendant Satterfield maintained that Co-Diagnostics' tests were between 99.52% and 100% accurate in certain unspecified FDA and European studies and that there had been no complaints from anyone in the fifty countries that Co-Diagnostics had supplied with tests.

131.    Typically, the difference between a 99.5% and 100% accuracy rate is virtually nonexistent. However, in diagnostic testing of infectious diseases, the mere 0.5% difference can have a substantial effect on whether policymakers can rely on the results of the test to formulate plans and indorse directives to reduce the spread of the virus.

132.    For instance, if approximately 5% of individuals showing symptoms of the virus test positive for COVID-19, then only about 50 symptomatic people test positive per 1,000 tests administered.[11] If the COVID-19 diagnostic test used in Utah has a specificity of 99.5%, five false positives would follow, i.e. five people would test positive for the virus but not actually have the virus. Therefore, approximately 10% of the individuals who tested positive, i.e. five people out of fifty, would not, in fact, have COVID-19. Accordingly, even a diagnostic test with a seemingly high specificity may fail to successfully and adequately guide public health policy vis-à-vis testing and contact tracing.

133.    In Utah, Co-Diagnostics' test results appear to have fared poorer than the numbers reflected in the foregoing hypothetical. According to public news reports, even in symptomatic

---

[10] However, according to Robyn Atkinson-Dunn, who was, until recently, the director of Utah's public-health laboratory, the divergence in the positivity rates remained apparent even after controlling for asymptomatic patients.

[11] As noted herein, this figure is largely representative of and congruent with the actual data that has steadily resulted from diagnostic testing for COVID-19 in Utah.

Utahns, Co-Diagnostics' tests have yielded a positive test rate of only between 1% and 2%. These results indicate that Co-Diagnostics' tests were only accurately measuring approximately half of the true amount of patients infected with COVID-19. Consequently, in contradiction to Defendant Satterfield's and the rest of the Individual Defendants' claims, it is very likely that Co-Diagnostics' tests are not only less than 100% accurate, but that Co-Diagnostics' tests are even less than 99.5% accurate.

### *May 1, 2020 Press Release*

134.    Immediately thereafter, on May 1, 2020, Co-Diagnostics issued a press release titled: "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations." In the press release, the Company stated, in relevant part:

> Co-Diagnostics, Inc. (Nasdaq: CODX) (the Company), a molecular diagnostics company with a unique, patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating **100% sensitivity and 100% specificity**, **the metrics used to determine accuracy in molecular diagnostics testing**.
>
> The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations were conducted in Mexico by the Mexican Department of Epidemiology ("InDRE"), India, and elsewhere in the US and abroad. **Each study concluded 100% concordance for both specificity and sensitivity**.

(Emphasis added.)

135.    Although Defendant Satterfield had conceded that the tests might be less than 100% accurate just days prior, he did not mention that the tests might be less than 100% accurate in the press release. Instead, Defendant Satterfield stated, in relevant part:

> In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, **we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that**.

(Emphasis added.)

### *Proactive Investor Article*

136.    On May 1, 2020, Proactive Investors ("Proactive") published an article entitled "Co-Diagnostics says coronavirus test shows spotless sensitivity data in independent evaluations," which reported and restated the Company's press release earlier that day. Additionally, the article reported that Defendant Satterfield "cited the test's low limit of detection, meaning its ability to detect the virus even at small concentrations" as an explanation for the test's stellar accuracy.

137.    However, as referenced below in more detail, a prior study had already found the limit of detection of the Company's COVID-19 diagnostic tests to be relatively high in comparison with many of its competitors. Therefore, Defendant Satterfield's comments touting the test's limit of detection were false and misleading.

### *May 4, 2020 Press Release*

138.    On May 4, 2020, Co-Diagnostics issued a press release announcing that the Company's COVID-19 test has been approved for sale in Mexico. The press release stated, in relevant part:

> Co-Diagnostics also announced that CoSara, the Company's joint venture for manufacturing in India, expects to now begin filling orders following the successful evaluation of CoSara's Saragene™ COVID-19 RT-PCR test kit by the Indian Council of Medical Research (ICMR). **The evaluation showed 100% sensitivity**

**and 100% specificity without any cross reactivity with other respiratory viruses**, and it has been cleared for sale to the Indian market.

(Emphasis added.)

### May 14, 2020 Press Release & Conference Call

139.    On May 14, 2020, Co-Diagnostics issued a press release (the "May 14 Press Release") announcing the filing of its operating results for the three-month period ending March 31, 2020, and provided updates on Company developments. The Company stated, in relevant part:

> **Q2 2020 Mid-Quarter Highlights:**
> - Receives FDA Emergency Use Authorization on COVID-19 test kit on April 3, 2020;
> - Company manufactures more than 6 million COVID-19 tests to date, and has ordered components for more than 20 million additional tests to fill existing and expected orders in the near future;
> - Records COVID-19 test and equipment sales of over $18 Million YTD through mid-second quarter (unaudited);
> - Receives COVID-19 test orders from public and private organizations in nearly 50 countries and over 15 states in the U.S.;
> - **COVID-19 test kit shows 100% specificity and 100% sensitivity in several independent evaluations**;

(Emphasis added.)

140.    Also on May 14, 2020, Co-Diagnostics held a conference call (the "May 14 Conference Call") to discuss the Company's operating results for the three months ended March 31, 2020. On the call, Defendant Egan and Defendant Benson reported that the Company had achieved record sales, but did not address reports relating to testing accuracy whatsoever, and failed to correct or clarify the Individual Defendants' prior statements that Co-Diagnostics' tests were less than 100% accurate.

***May 15, Form 8-K***

141.    On May 15, 2020, the Company filed a Form 8-K with the SEC (the "May 15 8-K"), signed by Defendant Egan, disclosing that the Company (1) issued the May 14 Press Release; (2) held the May 14 Conference Call; and (3) annexed as exhibits the May 14 Press Release and the transcript of the May 14 Conference Call ("Form 8-K Exhibits"). The Form 8-K incorporated by reference the Form 8-K Exhibits. Although, just one day earlier, the FDA had announced publicly that no COVID-19 test is 100% accurate, the Form 8-K filed by the Company maintained that Co-Diagnostics' **"COVID-19 test kit shows 100% specificity and 100% sensitivity in several independent evaluations."**[12]

142.    Co-Diagnostics did not release any clarifying statement about the accuracy of its test and has not addressed the allegations in public filings or press releases.

143.    The statements and omissions referenced in ¶¶ 125–127, 129–130, 134–136, and 138–142 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company's COVID-19 tests were less than 100% accurate; (2) the commercial viability of the Company was overstated in light of the true accuracy and efficacy of the Company's COVID-19 tests; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, the Individual Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact

---

[12] Emphasis added.

at all relevant times.

**The Truth Begins to Emerge**

144.    In mid-May 2020, reputable third-parties with significant public platforms began to uncover and make known alarming information about the true accuracy of Co-Diagnostics' COVID-19 test.

*The Gazette Article*

145.    On May 13, 2020, The Gazette published an article questioning the "integrity" of Co-Diagnostic's test after seeing 1-2% of tests used by TestIowa—an Iowa-based COVID-19 testing initiative—come back "inconclusive."

*Salt Lake Tribune Article #2*

146.    One day later, on May 14, 2020, the Tribune reported that TestUtah.com "declined to join other major Utah labs in a joint experiment to confirm one another's quality." Moreover, the Tribune revealed that Co-Diagnostics' tests used by TestUtah "have a higher 'limit of detection'—that is, they require more of the virus to trigger a positive result—than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury." In other words, it was likely that Co-Diagnostics' tests had a much higher false negative reporting rate. As a result, potentially thousands of infected people were erroneously told that they did not have COVID-19.

147.    The Tribune also expressed concern relating to Co-Diagnostics' tests used by TestIowa as well as TestNebraska, another public-private initiative focused on increasing the rate of COVID-19 testing.

*Governor Reynolds Statement*

148.    Also on May 14, 2020, Iowa Governor Kim Reynolds issued a public statement, declaring, "I'm pleased to announce that the State Hygienic Lab completed the TestIowa validation process yesterday, achieving high ratings of 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives." Governor Reynolds' report of TestIowa's results undeniably contradict previous statements made by Co-Diagnostics and the Individual Defendants regarding the accuracy of the Company's COVID-19 test.

149.    Defendant Satterfield recently admitted that the lower positive rates for the Company's tests "has certainly got all of us scratching our heads a bit."

150.    However, despite the evidence to the contrary, the Individual Defendants continued to fail to revise their claims of 100% test accuracy.

*FDA Press Release*

151.    Notably, also on May 14, 2020, the FDA issued a press release "in the spirit of transparency" to inform the public of another life science company's struggle to develop an accurate diagnostic test for COVID-19. The FDA's press release stated, in relevant part, that:

> The FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test. **No diagnostic test will be 100% accurate** due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly.

(Emphasis added.)

152.    Based on the release of third-party information that brought Co-Diagnostics' bold claims of 100% accuracy into serious question, the Company's stock price began to fall, closing

at $22.13 per share on May 14, 2020, after hitting an intra-day low of $18.35 per share. The

Company's stock price further fell to close at $17.07 per share on May 15, 2020, representing a

loss in value of approximately 22.86% from the prior day's closing price.

### *May 20, 2020 Motley Fool Article*

153.    On May 20, 2020, the Motley Fool published an article titled "Is Co-Diagnostics'

Stock in a Bubble?" challenging the Company's purportedly 100% accurate COVID-19 test. The

article explained, in relevant part:

> In May, Co-Diagnostics announced its COVID-19 in vitro test had been found to
> have 100% accuracy, 100% specificity (likelihood of preventing a false-negative
> error), and 100% sensitivity (likelihood of preventing a false-positive error), as per
> independent verification in laboratories across the world.
>
> * * *
>
> **The devil is in the details**
>
> To start off, Co-Diagnostics came to the conclusion that its test was 100% effective
> on all three diagnostic dimensions (specificity, accuracy, and sensitivity) based on
> studies with small sample sizes. For example, laboratory testing of the Logix test
> kit conducted in Australia involved about 100 COVID-19-positive patients and 100
> COVID-19-negative patients. With a sample size that small, a low error rate, say
> 1% to 2%, could be really hard to detect. In fact, the study itself explicitly stated
> that the test could in fact be between 96% to 98% effective, rather than 100%.
>
> In addition, the testing environment is by no means indicative of the actual
> prevalence of COVID-19 in the population at this point in the pandemic. Among
> the test samples, 50% contained SARS-CoV-2, and obviously, at this point,
> nowhere near half the people in the world have been exposed to the coronavirus.
> "But wait a minute!" the intelligent reader might say. "Nothing in the world is
> perfect, so who cares if a test's results are off by 1% or 3%? Effectiveness of 97%
> is still nothing short of an A-plus. You're just being a devil's advocate, Zhiyuan!"
> Unfortunately, this is one of the cases where it is critical to pay attention to the devil
> in the details. In fact, a 1% or 3% error rate can render a in vitro test almost useless.
> Here's why.

Let us assume, for the sake of argument, the true sensitivity of Logix is 98%, and its true specificity is also 98%. In other words, the probability of the test delivering a false positive is 2%, and the probability of the test returning a false negative is also 2%. Both of these values are directly stated as being probable in studies citing Logix's range of effectiveness, and they are valid assumptions given that the test has not been fully vetted by the FDA or other regulators. It is also common knowledge that because there are not enough viral tests for the COVID-19, the number of people who have the virus is likely to be significantly higher than official figures. For example, it is estimated that up to 4.1% of the residents of Los Angeles County have COVID-19 antibodies. Let's use that 4.1% figure in our calculations as a measure of prevalence of COVID-19 (a lower prevalence would hurt the test even more). Assuming 1 million people are given the Logix test, 41,000 should test positive for an ongoing SARS-CoV-2 infection. However, if the test provides a false negative 2% of the time, only 98% of those 41,000 -- 40,180 -- would show up as positives.

On the other hand, out of the 959,000 people who were actually negative for the virus, a 2% error rate would yield 19,180 cases of false positives -- individuals who don't have the disease despite the test saying they do. All told, that makes 59,360 people getting positive results, but only 40,180 of them would actually be positive. That yields a predictive value of 67.7%.

In other words, if the Logix test only works as well as it does in this scenario -- and it's right 98% of the time -- there's still a 1-in-3 chance that the test will indicate you have COVID-19 even though you don't! As one can see, a 32.3% false-positive error rate isn't very good at all. This problem gets worse if we assume the same prevalence, but lower Logix's potential sensitivity and specificity estimates to 95% for both. In this scenario, the probability of getting a false positive increases to 55.2%! While the results are surprising, they nonetheless use the basics of conditional probability; here is a calculator in case you want to try it out for yourself. Furthermore, a recent New York University study on COVID-19 in vitro tests developed by Abbott Laboratories (NYSE: ABT) found them to be widely inaccurate and unacceptable for use in patients. Keep in mind, those tests were also promoted as having 100% sensitivity and 99.9% specificity in earlier investigations. Unfortunately, this just serves to highlight how difficult it is to develop an accurate test for diseases with a low rate of prevalence like COVID-19.

### *InvestorPlace Article*

154.    On May 28, 2020, InvestorPlace published an article citing to an evaluation of 26

different COVID-19 tests developed by Co-Diagnostics competitors which was conducted by a

non-profit organization called The Foundation for Innovative New Diagnostics ("FIND").

155.    The article revealed, in relevant part, that FIND's study concluded "that 18 of the

negative tests had a 100% accuracy rate" and "23 or the 26 tests had a higher accuracy rate on

positive results than Co-Diagnostics' 95% rate identified by the University of Iowa."

156.    Moreover, the article asserted that "[t]he 5% false-positive rate of Co-Diagnostics'

test seems too high and too differentiated from most of the tests evaluated by FIND to be due to

chance or an evaluation error."

## DAMAGES TO CO-DIAGNOSTICS

157.    As a direct and proximate result of the Individual Defendants' conduct, Co-

Diagnostics will lose and expend many millions of dollars.

158.    Such expenditures include, but are not limited to, legal fees associated with the

Securities Class Actions filed against the Company and each of the Individual Defendants, any

internal investigations, and amounts paid to outside lawyers, accountants, and investigators in

connection thereto.

159.    These expenditures also include, but are not limited to, compensation and benefits

paid to the Individual Defendants who breached their fiduciary duties to the Company.

160.    As a direct and proximate result of the Individual Defendants' conduct, Co-

Diagnostics has also suffered and will continue to suffer a loss of reputation and goodwill, and a

"liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust

enrichment.

## DERIVATIVE ALLEGATIONS

161.    Plaintiff brings this action derivatively and for the benefit of Co-Diagnostics to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Co-Diagnostics and unjust enrichment.

162.    Co-Diagnostics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

163.    Plaintiff is, and has been at all relevant times, a shareholder of Co-Diagnostics. Plaintiff will adequately and fairly represent the interests of Co-Diagnostics in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

164.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

165.    A pre-suit demand on the Board of Co-Diagnostics is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Egan, Durenard, Murphy, Nelson, and Serbin (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

166.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they

engaged in intentionally, willfully, knowingly, recklessly, or with gross negligence to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

167.     In complete abdication of their fiduciary duties, the Directors either intentionally, willfully, knowingly, recklessly, or with gross negligence participated in making and/or causing the Company to make the materially false and misleading statements and omissions alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

168.     The Directors knew of the falsity of the misleading statements at the time they were made. The development and commercialization of COVID-19 tests is currently the core operation of Co-Diagnostics. The accuracy of the COVID-19 tests is highly material to the Company's core operations, which is reflected in the Company' stock price and made clear by the Company's May 14 Press Release, May 14 Conference Call, and the Company's recent filings with the SEC, including, but not limited to, the Company's 2019 10-K, May 14 10-Q, and May 15 8-K.

169.     As Board members of Co-Diagnostics, charged with overseeing the Company's affairs, the Directors all must have had knowledge or information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Co-Diagnostics, the Directors must have been aware of the material facts surrounding the

accuracy of the COVID-19 tests described herein, including the revelations brought to light by third-parties, including, but not limited to, the Tribune, the Gazette, the FDA, and Governor Reynolds, and acknowledged by the Company's Chief Science Officer, Defendant Satterfield.

170.    This inference of actual knowledge of the falsity of the misleading statements and omissions at issue is further supported by the sophistication of the Company's Directors, which is touted in Co-Diagnostics filings with the SEC, as referenced above.

171.    Therefore, the Directors each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise, recklessly disregarded, or grossly neglected their duty of oversight to stop or correct such misleading statements and omissions.

172.    Additional reasons that demand on Defendant Egan is futile follow. Defendant Egan has served as a Company director since April 2013 and serves as Chairman of the Board. He also serves as the Company's CEO and President, and is thus, as the Company admits, a non-independent director. He receives handsome compensation from the Company, including $460,000 in the fiscal year ended December 31, 2019. Defendant Egan was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein. As Chairman of the Board, CEO, and President, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Egan signed, and thus personally made the false

and misleading statements in the May 15 8-K referenced herein, in addition to falsely representing that the Company's COVID-19 test was 100% accurate in the Company's press releases. Furthermore, Defendant Egan is a defendant in the Securities Class Actions. For these reasons, too, Defendant Egan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Durenard is futile follow. Defendant Durenard has served as a Company director since June 2019, and serves as Chair of the Audit Committee. He has received and continues to receive compensation from the Company for his role on the Board, including $45,250 in the fiscal year ended December 31, 2019. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Durenard is a defendant in the Securities Class Actions. For these reasons, too, Defendant Durenard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy has served as a Company director since June 2019 and serves as a member of the Audit Committee. He has received and continues to receive compensation from the Company for his role on the Board, including $29,750 in the fiscal year ended December 31, 2019. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the

Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Murphy is a defendant in the Securities Class Actions. For these reasons, too, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Nelson is futile follow. Defendant Nelson has served as a Company director since August 2019. He has received and continues to receive compensation from the Company for his role on the Board, including $45,833 in the fiscal year ended December 31, 2019. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Nelson is a defendant in the Securities Class Actions. For these reasons, too, Defendant Nelson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Serbin is futile follow. Defendant Serbin has served as a Company director since May 2017 and serves as a member of the Audit Committee. He has received and continues to receive compensation from the Company for his role on the Board, including $72,750 in the fiscal year ended December 31, 2019. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the

Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Serbin is a defendant in the Securities Class Actions. For these reasons, too, Defendant Serbin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on the Board is futile follow.

178.    All of the Directors breached the duty of candor by making, or causing the Company to make, false and misleading statements or omissions of fact regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Directors may not be indemnified for breaching the duty of candor. As a result, all of the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

179.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements or omissions of material fact to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

180.    Defendants Durenard, Murphy, and Serbin were members of Co-Diagnostics'
Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee
Charter, these Directors were expressly responsible for oversight of Co-Diagnostics' financial
reporting, internal controls, and compliance with applicable laws and regulations. These Directors'
participation in making or causing Co-Diagnostics to make the materially false and misleading
statements alleged herein represents either intentional infliction of harm, willful misconduct
reckless disregard, or gross neglect for their duties as members of the Audit Committee. Thus,
Defendants Durenard, Murphy, and Serbin face a substantial likelihood of liability and demand is
futile as to them.

181.    Co-Diagnostics has been and will continue to be exposed to significant losses due
to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against
themselves or others who were responsible for that wrongful conduct to attempt to recover for Co-
Diagnostics any part of the damages Co-Diagnostics suffered and will continue to suffer thereby.
Thus, any demand upon the Directors would be futile.

182.    The Individual Defendants' conduct described herein and summarized above could
not have been the product of legitimate business judgment as it was based on bad faith and
intentional, reckless, grossly negligent, or disloyal misconduct. Thus, none of the Directors can
claim exculpation from their violations of duty pursuant to the Company's charter (to the extent
such a provision exists). As a majority of the Directors face a substantial likelihood of liability,
they are self-interested in the transactions challenged herein and cannot be presumed to be capable
of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

183.    The acts complained of herein constitute violations of fiduciary duties owed by Co-Diagnostics' officers and directors, and these acts are incapable of ratification.

184.    The Directors may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Co-Diagnostics. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Co-Diagnostics, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

185.    If there is no directors' and officers' liability insurance, then the Directors will not cause Co-Diagnostics to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

186.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    Section 16-10a-840(1) of the Utah Revised Business Corporation Act (the "URBCA"), provides that "Each director shall discharge the director's duties as a director, including duties as a member of a committee, and each officer with discretionary authority shall discharge the officer's duties under that authority: (a) in good faith; (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) in a manner the director or officer reasonably believes to be in the best interest of the corporation."

189.    Section 16-10a-840(4) of the URBCA, provides that "A director or officer is not liable to the corporation [or] its shareholders … for any action taken, or any failure to take any action, as an officer or director, as the case may be, unless: (a) the director or officer has breached or failed to perform the duties of the office in compliance with this section; and (b) the breach or failure to perform constitutes gross negligence, willful misconduct, or intentional infliction of harm on the corporation or the shareholders."

190.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Co-Diagnostics' business and affairs.

191.    Each of the Individual Defendants violated and breached his or her fiduciary duties of loyalty, good faith, and due care, which constituted intentional infliction of harm on the Company, willful misconduct, or gross negligence, causing damage to the Company and its

shareholders, including Plaintiff, by wrongdoing that includes failing to reasonably inform themselves and consciously disregarding the best interests of the Company, failing to properly oversee the Company's operations, and failing to inform the Company and its shareholder about the wrongdoing alleged herein.

192.    The Individual Defendants' conduct set forth herein was due to their intentional, willful, reckless, or grossly negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, willfully, recklessly, or with gross negligence breached or disregarded their fiduciary duties to protect the rights and interests of Co-Diagnostics.

193.    In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

194.    In further breach of their fiduciary duties owed to Co-Diagnostics, the Individual Defendants intentionally, willfully, recklessly, or with gross negligence made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company's COVID-19 tests were less than 100% accurate; (2) the commercial viability of the Company was overstated in light of the true accuracy and efficacy of the Company's COVID-19 tests; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, the Individual Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

195.    The Individual Defendants also failed to correct and caused the Company to fail to

correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

196.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard or carelessness to a degree that showed utter indifference for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed intentionally, willfully, knowingly, recklessly, or with gross negligence and for the purpose and effect of artificially inflating the price of Co-Diagnostics' securities.

197.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard or carelessness to a degree that showed utter indifference for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed intentionally, willfully, knowingly, recklessly, or with gross negligence and for the purpose and effect of artificially inflating the price of Co-Diagnostics' securities.

198.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Co-Diagnostics has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    The misconduct alleged herein demonstrates that the Individual Defendants failed to discharge their fiduciary duties to the Company in good faith, with the care of an ordinarily prudent person in a like position under similar circumstances, and in a manner the Individual Defendants reasonably believed to be in the best interests of the Company.

201.    Plaintiff on behalf of Co-Diagnostics has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Co-Diagnostics.

204.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Co-Diagnostics that was tied to the performance or artificially inflated valuation of Co-Diagnostics, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

205.    Plaintiff, as a shareholder and a representative of Co-Diagnostics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

206.    Plaintiff on behalf of Co-Diagnostics has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Co-Diagnostics, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Co-Diagnostics;

(c)    Determining and awarding to Co-Diagnostics the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Co-Diagnostics and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Co-Diagnostics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or

Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

> 2. a provision to permit the shareholders of Co-Diagnostics to nominate at least three candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Co-Diagnostics restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated this 17th day of September, 2020

Respectfully submitted,

/s/  Jeremy M. Hoffman
Jeremy M. Hoffman

*Counsel for Plaintiff*

## VERIFICATION

I,      Luis Aguilera       am       a plaintiff  the       within   action.  I have  reviewed  the  allegations  made  in  this  shareholder  derivative complaint,  know  the  contents  thereof,  and  authorize  its  filing.  To  those allegations  of which  I have  personal knowledge, I believe  those allegations  to  be true.  As  to  those allegations  of which  I  do  not have  personal knowledge, I rely upon my  counsel  and  their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2020.

8/25/2020

_Luis Aguilera_
C46410782DAC480...
Luis Aguilera