**ANDERSON & KARRENBERG**
Jared D. Scott, Esq. (Utah Bar No. 15066)
Broadway Media Building
50 West Broadway, Suite 600
Salt Lake City, UT 84101
Email: jscott@aklawfirm.com

*Liaison Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
501 Fifth Avenue South, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com

*Co-Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| IN RE CO-DIAGNOSTICS, INC. DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Lead Case No.: 2:20-cv-00654-JNP-CMR<br><br>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY;**<br>**(2) UNJUST ENRICHMENT;**<br>**(3) WASTE OF CORPORATE ASSETS; AND**<br>**(4) CONTRIBUTION UNDER THE EXCHANGE ACT**<br><br>JURY TRIAL DEMANDED |

1

<u>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiffs Luis Aguilera and Cindy Maloney, Executrix of the Estate of Melvyn Klein ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company"), file this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against Individual Defendants Dwight H. Egan ("Egan"), Reed L. Benson ("Benson"), Brent Satterfield ("Satterfield"), Eugene Durenard ("Durenard"), Edward Murphy ("Murphy"), James Nelson ("Nelson"), and Richard S. Serbin ("Serbin") (collectively, the "Individual Defendants," and together with Co-Diagnostics, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Co-Diagnostics, unjust enrichment, waste of corporate assets, and violations of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Defendants, Plaintiffs' allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Co-Diagnostics, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed

by Co-Diagnostics' directors and officers from May 1, 2020 through May 15, 2020 (the "Relevant Period").

2.      Co-Diagnostics is a molecular diagnostics company that develops and sells molecular tools, such as molecular diagnostic tests for the detection of infectious diseases.

3.      As is now well-known, a novel coronavirus and respiratory illness, designated as COVID-19, originated in China in late 2019. After beginning to rapidly sweep through the world's human population, the World Health Organization declared COVID-19 a pandemic on March 11, 2020. Shortly afterwards, on March 13, 2020, the United States declared a national emergency concerning the COVID-19 outbreak. The virus has resulted in millions of infections and hundreds of thousands of deaths in the United States to date and has impacted the global economy and many national healthcare systems.

4.      In attempting to contain, control, and prevent the mass transmission of COVID-19, world leaders, including U.S. federal and state government officials and public health officials, have implemented extraordinary policy measures such as sheltering-in-place, quarantining, and social distancing measures. Within the United States, the development of reliable mass testing techniques for COVID-19 has heavily guided many lawmakers' strategies.

5.      For state and federal government officials, possessing accurate methods of testing for COVID-19 has become a vitally important tool for reducing the spread of the virus. Accurate tests that are readily accessible to the public provide much-needed data on where the most serious outbreaks of the virus occur, and offer insight into where medical and other resources should be allocated, and what public policy measures are appropriate or effective.[1]

---

[1] *See generally* Rob Stein, Carmel Wroth & Alyson Hurt, *U.S. Coronavirus Testing Still Falls Short. How's Your State Doing?*, NPR (May 7, 2020, 5:00 AM), https://www.npr.org/sections/health-shots/2020/05/07/851610771/u-s-coronavirus-testing-still-

6.      In an effort to mitigate the virus' damage, U.S. officials have worked with many businesses, including life science, biotechnology, and pharmaceutical companies to develop COVID-19 tests, treatments, and vaccines. Although many corporate leaders have risen to this unique challenge, the Individual Defendants failed to meet this moment with the professional aptitude, honesty, and integrity this historic undertaking requires.

7.      Early in the COVID-19 pandemic, it appeared that Co-Diagnostics was able to utilize its molecular diagnostic testing experience and knowledge to quickly develop an exceptionally accurate diagnostic test for COVID-19 that simultaneously produced speedy results. The supposed effectiveness of the Company's tests was established by the Company's scientists, including founder and former Chief Science Officer ("CSO"), Defendant Satterfield. As a result, Co-Diagnostics' COVID-19 test was first to an extremely competitive and time-sensitive market.

8.      Specifically, according to the Company's prospectus supplement on Form 424B5 filed with the SEC on February 28, 2020 (the "2020 Prospectus Supplement"), Co-Diagnostics announced the completion of the "principle design work" for a rapid initial screening test for COVID-19 on January 23, 2020.

9.      According to the 2020 Prospectus Supplement, on February 20, 2020, Co-Diagnostics announced that its COVID-19 test had been "submitted for registration with the European Community" and that it was expected to be available for sale to certain European markets later that month.

10.     The 2020 Prospectus Supplement declared that Co-Diagnostics' COVID-19 test

falls-short-hows-your-state-doing (explaining the importance of testing for COVID-19); Rob Stein, *As Coronavirus Surges, How Much Testing Does Your State Need to Subdue the Virus?*, NPR (June 30, 2020, 5:05 AM), https://www.npr.org/sections/health-shots/2020/06/30/883703403/as-coronavirus-surges-how-much-testing-does-your-state-need-to-subdue-the-virus (explaining the importance of testing for COVID-19).

became the first in the world to obtain regulatory clearance on February 24, 2020, when it obtained the CE marking, enabling its sale in the European Community.

11.     Thereafter, as explained in the 2020 Prospectus Supplement, Co-Diagnostics began to sell its market-first COVID-19 test in late February and early March of 2020 to numerous countries and various labs within the United States.

12.     On April 6, 2020, Co-Diagnostics announced that it had received emergency use authorization for its COVID-19 tests from the U.S. Food and Drug Administration ("FDA"). Also in April 2020, Co-Diagnostics' COVID-19 test was approved for manufacture and sale in India and Mexico.

13.     On May 1, 2020, the Company issued a press release in which Defendant Satterfield described the Company's COVID-19 tests as "100% accurate," even though they were not and Defendant Satterfield, and the other Individual Defendants, knew they were not. Subsequent media reports demonstrate that the investing public took this claim at face value at that time.

14.     The truth was that—despite Defendant Satterfield's assertion to the contrary—Co-Diagnostics' COVID-19 tests were materially less than 100% accurate. When it comes to diagnostic testing, even a seemingly minor inconsistency in precision—of one or two percentage points—can have highly significant ramifications on the usefulness of a diagnostic testing product.[2]

---

[2] As explained in greater detail below, diagnostic tests intended for widespread public use, must be decidedly exact to provide significant value given that an accuracy rate even marginally less than 100% can render a test futile in practice. For instance, if a diagnostics test has a 98% "sensitivity" rate (which measures how well a test identifies true positives) and a 98% "specificity" rate (which measures how well a test identifies true negatives), the upshot is that approximately one-third of the tests will yield a false positive result. Accordingly, holding diagnostic tests to a near perfect standard in clinical trials is vital to ensuring a reliable and safe product is delivered to the public.

15.    Then, in mid-May 2020, news outlets reported, among other things, that Co-Diagnostics was reluctant to participate in a joint experiment designed to perform a side-by-side comparison of the quality and accuracy of various COVID-19 tests. Instead, Co-Diagnostics agreed to participate in a "condensed" version of the trial. However, the results of that abridged research were reportedly to be kept private.

16.    On May 14, 2020, following these media reports, the Company's stock price plummeted from its record high of $29.72 per share as various reputable sources published reports or issued statements challenging and contradicting Co-Diagnostics' claims that its COVID-19 tests were 100% accurate. The Company's stock hit an intra-day low of $18.35 per share, a drop greater than 38%, before closing at $22.13 per share, approximately a 25.5% decrease.

17.    By the evening of May 14, 2020, in light of inaccurate test results related to one of Co-Diagnostics' competitors, the FDA deemed it important, "in the spirit of transparency," to issue a press release alerting the public that "[n]o diagnostic test [for COVID-19] will be 100% accurate[.]"

18.    As a result, on May 15, 2020, the price of the Company's stock continued to drop to an intra-day low of $15.80 per share, a nearly 47% drop from its historic high only two days prior.

19.    As of March 2022, the Company's stock trades for approximately $6 per share.

20.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a materially false and misleading statement regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants intentionally, willfully, recklessly, or with gross negligence made and/or caused the Company to make a materially false and misleading statement

that failed to disclose, *inter alia*, that: (1) the Company's COVID-19 tests were materially less than 100% accurate; (2) the Company's commercial viability was overstated in light of the true accuracy and efficacy of the Company's COVID-19 tests; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' representations about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

21.     In further breach of their fiduciary duties owed to Co-Diagnostics, the Individual Defendants failed to maintain internal controls.

22.     The Individual Defendants were motivated to perpetrate this fraud, *inter alia*, given the troubles the Company was experiencing, including the possibility of being delisted by NASDAQ, which could be abated if Co-Diagnostics were able to capitalize on the first-mover advantage of having a nominally foolproof test in the earliest stages of the pandemic.

23.     The Company's common stock was in danger of being delisted because it traded for under $1 per share for a few days leading up to and then following January 1, 2020, which was the second time in recent memory it had dipped below this milestone. The Company's common stock had stayed below $1 per share for an extended period from May 2019 until July 2019. The boost to the Company's share price brought about by the announcement of supposedly flawless tests removed the Company from this danger.

24.     Moreover, after the truth began to emerge, five of the Individual Defendants—Defendants Benson, Durenard, Egan, Nelson, and Serbin—engaged in lucrative insider sales even as the Company's common stock continues to decline, further evidencing their motive to participate in the scheme.

25.     In light of the Individual Defendants' misconduct—which has subjected the

Company, its Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), its former CSO, and each of the members of its Board of Directors (the "Board") to consolidated securities fraud class action lawsuits pending in this Court (the "Securities Class Action"), and has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

26.     The Company has been substantially damaged as a result of the Individual Defendants' intentional, willful, reckless, or with grossly negligent breaches of fiduciary duty and other misconduct.

27.     In light of the foregoing breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in the Securities Class Action and this derivative action, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

30.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who is a citizen of Utah or who has minimum contacts with this District to justify the exercise of jurisdiction over him.

33.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiffs

34.     Luis Aguilera is a current shareholder of Co-Diagnostics. Luis Aguilera has continuously held Co-Diagnostics common stock at all relevant times. Luis Aguilera is a citizen of Sweden.

35.     Cindy Maloney, Executrix of the Estate of Melvyn Klein, has continuously held Co-Diagnostics common stock in the Estate at all relevant times. The Estate of Melvyn Klein continuously held Co-Diagnostics common stock at all relevant times after his death and remains

a current shareholder of Co-Diagnostics. Cindy Maloney, Executrix, is a citizen of New York, pursuant to 28 U.S.C. § 1332(c)(2).

**Nominal Defendant Co-Diagnostics**

36.     Co-Diagnostics is a Utah corporation with its principal executive offices at 2401 S. Foothill Drive, Suite D, Salt Lake City, Utah 84109. Co-Diagnostics' shares trade on the NASDAQ under the ticker symbol "CODX."

**Defendant Egan**

37.     Defendant Egan has served as the Company's CEO, President, and Chairman since April 2013. According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), as of March 19, 2020, Defendant Egan beneficially owned 150,000 shares of the Company's common stock.[3] Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Egan owned approximately $1.6 million worth of Co-Diagnostics stock.

38.     For the fiscal year ended December 31, 2020, Defendant Egan received $1,463,625 in compensation from the Company. This included $309,375 in salary, a $350,000 bonus, and $786,750 in stock awards, and $17,500 in other compensation.

39.     Since the truth of the misconduct at issue began to emerge, Defendant Egan has continued to profit from the boost that the misconduct gave to the Company's share price, making repeated insider sales, for an aggregate value of approximately $1.8 million, even as the Company's share price steadily declines.

40.     The Company's Schedule 14A filed with the SEC on August 9, 2019 (the "2019 Proxy Statement") stated the following about Defendant Egan:

---

[3] Includes exercisable options to acquire 150,000 shares of common stock, as of March 19, 2020.

**Dwight H. Egan** has been an officer and director since April 2013. Mr. Egan has been engaged in private investment business from February 1999 to the present. He was a senior executive at Data Broadcasting Corporation, a leading provider of wireless, real-time financial market data, news and sophisticated fixed- income portfolio analytics to 27,000 individual and professional investors from 1995 to 1999. He co-founded and served as CEO and Chairman of the Board of Broadcast International, Inc. from 1984 to 1995, when Data Broadcasting Corporation acquired Broadcast International and created *CBS MarketWatch*, a leading financial news site and participated in its initial public offering. Mr. Egan's prior experience in directing a public company and working with capital markets gives him valuable experience in advising the board on matters of finance and operations.

41.     Upon information and belief, Defendant Egan is a citizen of Utah.

**Defendant Benson**

42.     Defendant Benson has served as the Company's General Counsel since at least February 2021. He previously served as the Company's CFO from November 2014 until February 2021, and as the Company's Corporate Secretary from April 2013 until July 2021. Previously, he served as a member of the Company's Board from November 2014 until May 2017.

43.     According to the 2019 10-K, as of March 19, 2020, Defendant Benson beneficially owned 125,000 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Benson owned approximately $1.3 million worth of Co-Diagnostics stock.

44.     For the fiscal year ended December 31, 2020, Defendant Benson received $742,433 in compensation from the Company. This included $211,458 in salary, a $225,000 bonus, $288,475 in stock awards, and $17,500 in other compensation.

45.     Since the truth of the misconduct at issue began to emerge, Defendant Benson has continued to profit from the boost that the misconduct gave to the Company's share price, making

---

[4] Includes presently exercisable options to acquire 125,000 shares of common stock, as of March 19, 2020.

insider sales, for an aggregate value of approximately $1.9 million, even as the Company's share price steadily declines.

46.   The Company's 2019 Proxy Statement stated the following about Defendant Benson:

> **Reed L. Benson** has been Chief Financial Officer and Secretary from November 2014 to the present and a director from November 2014 to May 2017. Since September, 2008 to the present, in addition to the private practice of law, he is a founder and partner of Legends Capital Group, LLC, a privately held venture capital group that identifies investment opportunities in natural resources, bio tech and technology fields. From October 2004 to September 2008 he was employed as Chief Financial Officer, Secretary, and General Counsel and member of Board of Directors of Broadcast International, Inc., a publicly traded communications services company. From 2001 to October 2004, he was in the private practice of law where his practice focused on tax and business-related matters. From July 1995 to January 2001 he was secretary and general counsel for Data Broadcasting Corporation, a provider of market information to individual investors. Mr. Benson received his J.D. degree from the University of Utah School of Law in 1976 and a Bachelor of Science Degree in Accounting from the University of Utah in 1971. Mr. Benson became a Certified Public Accountant in 1974. Mr. Benson's experience in finance, accounting and business consulting, together with his role as our CFO and prior public company directorship, provide Mr. Benson with expertise enabling critical input to our company.

47.   Upon information and belief, Defendant Benson is a citizen of Utah.

**Defendant Satterfield**

48.   Defendant Satterfield served as the Company's CSO from April 2013 until February 2021.[5] Previously, he served as a member of the Company's Board from April 2013 until April 2019.

49.   According to the 2019 Proxy Statement, as of July 30, 2019, Defendant Satterfield beneficially owned 1,359,794 shares of the Company's common stock,[6] which represented 7.9%

---

[5] The Company's 2019 10-K also refers to Defendant Satterfield as the Company's Chief Technology Officer.

[6] According to the 2019 Proxy Statement, the shares owned by Dr. Satterfield were subject to pending litigation regarding a loan and pledge agreement with lenders.

of the Company's outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on July 30, 2019 was $1.31, Defendant Satterfield owned approximately $1.8 million worth of Co-Diagnostics stock.

50.     Despite having been employed by the Company for the duration of the fiscal year ended December 31, 2020, Defendant Satterfield's total compensation for that year is not disclosed in either the Form 10-K filed with the SEC on March 25, 2021 for the fiscal year ended December 31, 2020 (the "2020 10-K") or the proxy statement filed with the SEC on June 22, 2021 (the "2021 Proxy Statement"). However, both the 2020 10-K and 2021 Proxy Statement disclose that Defendant Satterfield received $120,000 in royalty payments in 2020 for pursuant to a technology license agreement.

51.     The Company's 2019 Proxy Statement stated the following about Defendant Satterfield:

> **Brent Satterfield** has been our Chief Science Officer since April 2013. Dr. Satterfield has been employed by the Company from January 31, 2015 to the present. Prior to that he was the sole shareholder and owner of DNA Logix, Inc. from January 2013 to January 31, 2015, and in DNA Logix he developed and patented the technology now owned by the Company. He founded Co-Diagnostics in April 2013 and is the first in his field to use engineering mathematics to design new DNA testing technology. From 2006 to 2008, he was employed by Arcxis Biotechnologies where he developed new diagnostic platforms for groups such as the Department of Homeland Security, the National Biodefense Analysis and Countermeasures Center, the United States Army Medical Research Institute of Infectious Disease, Sandia National Laboratories, the California Department of Public Health and numerous others. Under fellowship from the Department of Homeland Security, he received his Ph.D. in 2007 in Bioengineering with an emphasis in entrepreneurship and intellectual property law from Arizona State University in a dual-enrollment program with UC Berkeley. Dr. Satterfield's experience with the science underlying all of the Company's products and technology gives him valuable experience in advising the board on the status of the products and our positioning in the diagnostic testing industry.

52.     Upon information and belief, Defendant Satterfield is a citizen of Utah.

**Defendant Durenard**

53.     Defendant Durenard has served as a member of the Company's Board since June 2019. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

54.     According to the 2019 10-K, as of March 19, 2020, Defendant Durenard beneficially owned 25,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Durenard owned approximately $265,000 worth of Co-Diagnostics stock.

55.     For the fiscal year ended December 31, 2020, Defendant Durenard received $229,900 in compensation from the Company. This included $55,000 in fees earned or paid in cash $70,000 in option awards, and $104,900 in stock awards.

56.     In late May 2020, Defendant Durenard sold approximately $916,000 of Company common stock before the price of the Company's common stock declined sharply, evidencing his motive in contributing to and participating in the scheme.

57.     Since then, Defendant Durenard has continued to profit from the boost the misconduct gave to the Company's share price, making additional insider sales for an aggregate value of approximately $228,000, even as the Company's share price steadily declines.

58.     The Company's 2019 Proxy Statement stated the following about Defendant Durenard:

> **Eugene Durenard** is the Founder and CEO of Hyperbolic Holdings, a Swiss-based holding, management consulting and investment advisory company specialized in healthcare since February 2018. He is co-Founder and CIO of Healthcare Impact Holdings, an investment fund specialized in later-stage healthcare private ventures since May 2018. He is co-Founder and Trustee of Healthcare Impact Foundation, a charitable organization designed to sustainably fund the translation of innovation in life sciences since September 2017. He is co-Founder of Global Better Health, a platform designed to provide scientifically-based corporate wellness and preventive

programs since December 2018. He is an advisor to and Managing Director of the Stetson Family Office since September 2016. Prior to joining the Stetson Family Office, he was CIO of a NYC family office operation. In 2006 he co-founded Orion Investment Management, an institutional asset manager in Bermuda. After its sale in 2011 and until 2013 he co-headed their asset management group. Dr. Durenard brings a thorough multi-asset class investment and entrepreneurial experience spanning 20 years to the Company's Board of Directors. He received his Ph.D. in Mathematics at Harvard in 1995 before beginning his career with Salomon Brothers in London in proprietary research.

59.     Upon information and belief, Defendant Durenard is a citizen of Utah.

**Defendant Murphy**

60.     Defendant Murphy has served as a member of the Company's Board since June 2019. He also serves as a member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee.

61.     According to the 2019 10-K, as of March 19, 2020, Defendant Murphy beneficially owned 25,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Murphy owned approximately $265,000 worth of Co-Diagnostics stock.

62.     For the fiscal year ended December 31, 2020, Defendant Murphy received $106,000 in compensation from the Company. This included $36,000 in fees earned or paid in cash and $70,000 in option awards.

63.     The Company's 2019 Proxy Statement stated the following about Defendant Murphy:

> **Edward L. Murphy,** who joined our Board of Directors in June 2019, currently serves as a senior vice president and a partner of Dover Investments Ltd., a private investment firm. Throughout his career, Mr. Murphy's duties have included investment analysis of various types of investment projects in real estate and financial services. Currently, Mr. Murphy serves on the board of directors of several Canadian publicly reporting companies that have interests in various industries. He has been a Director at Empire Minerals Corporation Inc. since January 2016, at Digicrypts Blockchain Solutions Inc. since June 2011, at Lakefield Marketing

Corporation since February 2018, and at the Mosport Park Entertainment Corporation since April 30, 1997. He served as a Director at Aurquest Resources from May 2003 to December 2017. Mr. Murphy's experience in the capital markets outside the United States and his involvement in investment analysis shall be a benefit to the Board of Directors.

64.     Upon information and belief, Defendant Murphy is a citizen of Utah.

**<u>Defendant Nelson</u>**

65.     Defendant Nelson has served as a member of the Company's Board since August 2019. He also serves as the Chair of the Corporate Governance and Nominating Committee and as a member of the Audit Committee and the Compensation Committee.

66.     According to the 2019 10-K, as of March 19, 2020, Defendant Nelson beneficially owned 25,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Nelson owned approximately $265,000 worth of Co-Diagnostics stock.

67.     For the fiscal year ended December 31, 2020, Defendant Nelson received $125,000 in compensation from the Company. This included $55,000 in fees earned and $70,000 in option awards.

68.     Since the truth of the misconduct at issue began to emerge, Defendant Nelson has continued to profit from the boost that the misconduct gave to the Company's share price, making an insider sale, for approximately $127,000, even as the Company's share price steadily declines.

69.     The Company's 2019 10-K stated the following about Defendant Nelson:

**James Nelson** is the retired Chairman and CEO of Sunworks, Inc., a NASDAQ traded commercial, agriculture, and residential solar Integrator which he helped found in October 2010. Mr. Nelson currently serves as strategic advisor to three other publicly traded companies. Jim has spent most of his career working in private equity as a general partner with Peterson Partners and with Millennial Capital Partners. In addition to his investment and financial responsibilities, he served as CEO of two of his firms' portfolio companies. Prior to his years in private equity, Mr. Nelson served as Vice President of Marketing at Banana Republic, where he

managed company-wide marketing, as well as the company's international expansion initiative. He was also general manager for Banana Republic's catalog division. He was Vice President of Marketing and Corporate Development at Saga Corporation, a multi-billion-dollar food service company. Jim began his executive career over 35 years ago at Bain and Company, a business strategy consulting firm, where he managed teams of consultants on four continents. Mr. Nelson received his MBA from Brigham Young University, where he graduated summa cum laude and was named the Outstanding Master of Business Administration Graduate. Mr. Nelson's advice to the Board of Directors from his experiences as a chief executive officer and strategic advisor shall be useful to the Board of Directors.

70. Upon information and belief, Defendant Nelson is a citizen of Utah.

**Defendant Serbin**

71. Defendant Serbin has served as a member of the Company's Board since May 2017. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and the Corporate Governance and Nominating Committee.

72. According to the 2019 10-K, as of March 19, 2020, Defendant Serbin beneficially owned 45,455 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2020 was $10.60, Defendant Serbin owned approximately $482,000 worth of Co-Diagnostics stock.

73. For the fiscal year ended December 31, 2020, Defendant Serbin received $316,830 in compensation from the Company. This included $68,500 in fees earned or paid in cash, $70,000 in option awards, and $178,330 in stock awards.

74. In late May 2020, Defendant Serbin sold approximately $913,000 of Company common stock before the price of the Company's common stock declined sharply, evidencing his motive in contributing to and participating in the scheme.

75. Since then, Defendant Serbin has continued to profit from the boost the misconduct gave to the Company's share price, making additional insider sales for an aggregate value of approximately $275,000, even as the Company's share price steadily declines.

76.     The Company's 2019 Proxy Statement stated the following about Defendant

Serbin:

> **Richard S. Serbin,** who joined our Board of Directors in May 2017, currently
> serves as a consultant to many companies in the healthcare industry. He was
> the President of Corporate Development and In-House Legal Counsel at Life Science
> Institute, LLC, from June 1, 2013 to July 15, 2014. Mr. Serbin is a global strategy
> advisor, pharmacist and entrepreneur with credentials both in pharmacy and law,
> complemented by more than 40 years of service as an FDA regulatory attorney and
> patent attorney in the healthcare industry. He was appointed to the Advisory Board
> of Cure Pharmaceutical in January 2017 and has been a Member of Advisory Board
> at Prime Access, Inc. since September 2015. Mr. Serbin has been a Director at
> Rapid Nutrition Plc since November 18, 2014. He served as Director at Viropro
> Inc. from May 2013 to June 2014. He was Head of Business Advisory Board at
> Mazal Plant Pharmaceuticals Inc. from October 2006 to September 2007 and also
> served as its Member of Business Advisory Board. He served as Chief Executive
> Officer of Optigenex Inc. from July 2002 to September 15, 2005 and a director from
> July 2004 to September 2005. From January 1999 until July 2002 Mr. Serbin served
> as a consultant to various pharmaceutical companies. He served as the President of
> Bradley Pharmaceuticals. He served as Vice President of Corporate Development
> at Ortho Pharmaceuticals, a Johnson & Johnson subsidiary, and practiced Patent
> and FDA law at Revlon Johnson & Johnson and Schering-Plough. He served as
> Patent Attorney for Schering Plough Corporation and Chief FDA Counsel for
> Revlon Corporation and Johnson and Johnson Corporation. Subsequently, he
> worked at Revlon Corporation, as its Chief Food, Drug and Cosmetic Counsel. He
> founded Radius Scientific Corporation. He was J&J's Vice President of Corporate
> Development, and later led a successful public offering venture based on
> technology developed at Stanford Medical School. Mr. Serbin spent a large portion
> of his career focusing on international markets and clients. While at J&J, Mr. Serbin
> served on the Board of Directors of 16 US and international subsidiary companies,
> including Ethicon, Ortho, J&J Consumer Products, Pittman-Moore, Mc Neil, and
> J&J Development Corporation. He worked on multiple international acquisitions
> and strategic relationships, and sat on the Board of Directors of several of its
> international subsidiaries, including those in India, Hong Kong, Japan, Taiwan,
> Germany, and England. Mr. Serbin has a B.S. and a B. Pharmacy from Rutgers
> University and Rutgers University College of Pharmacy, a J.D. degree from Seton
> Hall Law School and a Masters Degree in Trade Regulations and Law from NYU
> Law School. Mr. Serbin's experience in business, law and medicine and knowledge
> gained as an advisor to the healthcare industry will be critical to our Board of
> Directors as it commercializes its products.

77.     Upon information and belief, Defendant Serbin is a citizen of Utah.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

78.     By reason of their positions as officers and/or directors of Co-Diagnostics and because of their ability to control the business and corporate affairs of Co-Diagnostics, the Individual Defendants owed Co-Diagnostics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Co-Diagnostics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Co-Diagnostics and its shareholders so as to benefit all shareholders equally.

79.     Each director and officer of the Company owes to Co-Diagnostics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

80.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Co-Diagnostics, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

81.     To discharge their duties, the officers and directors of Co-Diagnostics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

82.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

83.     The conduct of the Individual Defendants complained of herein involves a knowing

and culpable violation of their obligations as directors and officers of Co-Diagnostics, the absence of good faith on their part, an intentional or reckless disregard or a carelessness, that showed utter indifference for their duties to the Company and its shareholders because the Individual Defendants were aware or should have been aware that their actions and inactions posed a risk of serious injury to the Company.

84.     The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Co-Diagnostics' Board at all relevant times.

85.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

86.     To discharge their duties, the officers and directors of Co-Diagnostics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Co-Diagnostics were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

20

manner in accordance with the laws and regulations of Utah and the United States, and pursuant to Co-Diagnostics' own Code of Ethics for Senior Financial Officers (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Co-Diagnostics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Co-Diagnostics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Co-Diagnostics' operations would comply with all applicable laws and Co-Diagnostics' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial

information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87. Each of the Individual Defendants further owed to Co-Diagnostics and the shareholders the duty of loyalty requiring that each favor Co-Diagnostics' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

88. At all times relevant hereto, the Individual Defendants were the agents of each other and of Co-Diagnostics and were at all times acting within the course and scope of such agency.

89. Because of their advisory, executive, managerial, and directorial positions with Co-Diagnostics, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

90. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Co-Diagnostics.

## CO-DIAGNOSTICS' CODE OF ETHICS AND CORPORATE GOVERNANCE

### *Code of Ethics*

91. The 2019 Proxy Statement stated, in relevant part:

We have a Code of Ethics as defined in Item 406 of Regulation S-K, which code applies to all of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. ***All directors, officers, and other employees are expected to be familiar with the Code of Ethics and to adhere to the principles and procedures set forth therein.*** The Code of Ethics forms the foundation of a comprehensive program that requires compliance with all corporate policies and procedures and seeks to foster an open relationship among colleagues that contributes to good business conduct and an abiding belief in the integrity of our employees. Our policies and procedures cover all areas of professional conduct,

including employment policies, conflicts of interest, intellectual property, and the protection of confidential information, as well as strict adherence to all laws and regulations applicable to the conduct of our business.

***Directors, officers, and other employees are required to report any conduct that they believe in good faith to be an actual or apparent violation of the Code of Ethics.*** The full text of the Code of Ethics is available on our website. We intend to satisfy the disclosure requirements of Form 8-K regarding any amendment to, or a waiver from, any provision of our Code of Ethics by posting such amendment or waiver on our website.

(Emphasis added.)

92.    Pursuant to the Company's Code of Ethics:

The Corporation vests Senior Financial Officers with both the responsibility and authority to protect, balance, and preserve the interests of all persons involved with the Corporation, including but not limited to shareholders, customers, employees, and suppliers.

93.    The Code of Ethics defines Senior Financial Officers as "chief executive officer, principal financial officer, controller or principal accounting officer, and persons who perform similar functions."

94.    The Code of Ethics provides, as to "Honest and Ethical Conduct," in relevant part, that:

Senior Financial Officers will exhibit and promote the highest standards of honesty and ethical conduct through the establishment and operation of policies and procedures that:

*          *          *

- Demonstrate their personal support for such policies and procedures through periodic communication reinforcing these ethical standards throughout the finance department.

95.    Moreover, the Code of Ethics states, in relevant part:

- ...Members of the finance department, including Senior Financial Officers, are under a continuing obligation to disclose any situation that presents the possibility of a conflict or disparity of interest between the member and the Corporation. Disclosure of any potential conflict is the key to remaining in

full compliance with this Code of Ethics.

96.     The Code of Ethics provides, as to "Compliance with Applicable Laws, Rules and

Regulations," in relevant part, that:

> Senior Financial Officers will establish and maintain mechanisms to:
>
> - Educate members of the finance department about any federal, state or local statute, regulation or administrative procedure that affects the operation of the finance department and the Corporation generally, including but not limited to prohibitions against insider trading.
>
> - Monitor the compliance of the finance department with any applicable federal, state or local statute, regulation or administrative rule.
>
> - Identify, report, and correct in a swift and certain manner any detected deviation from applicable federal, state or local statute or regulation.
>
> - ***Ensure that disclosure in documents filed with the Securities and Exchange Commission and in other public communications is full, fair, accurate, timely, and understandable***.

(Emphasis added.)

97.     The Code of Ethics provides, as to a "Financial Records and Periodic Reports," in

relevant part, that:

> Senior Financial Officers will establish and manage the Corporation's transaction and reporting systems and procedures to ensure that:
>
> \*               \*               \*
>
> - Periodic financial communications and reports will be delivered in a manner that facilitates the highest degree of clarity of content and meaning so that readers and users will quickly and accurately determine their significance and consequence.

98.     The Code of Ethics mandates, in relevant part, that:

> Persons subject to disciplinary measures shall include, in addition to the violator, others involved in the wrongdoing such as (i) ***persons who fail to use reasonable care to detect a violation***, (ii) persons who if requested to divulge information withhold material information regarding a violation, and (iii) ***supervisors who approve or condone the violations*** or attempt to retaliate against employees or

agents for reporting violations or violators.

(Emphasis added.)

### *Co-Diagnostics' Audit Committee Charter*

99.    The Company's Audit Committee Charter provides that:

The purpose of the Audit Committee established by this charter will be to monitor and advise the board on:

1.  the integrity of the Company's financial statements and disclosures;

2.  the independent auditor's qualifications and independence;

3.  the performance of the Company's internal audit function and independent registered public accounting firm;

4.  the adequacy and effectiveness of the Company's internal controls;

5.  the Company's compliance with legal and regulatory requirements; and

6.  the processes utilized by management for identifying, evaluating, and mitigating strategic, financial, operational, regulatory, and external risks inherent in the Company's business (the "Risks").

100.    With respect to the Company's "Internal Controls," the Audit Committee Charter charges the Audit Committee with the following:

1.  Oversee the adequacy of the Company's system of internal controls and review with management, the internal audit department, and the Company's independent auditors the adequacy and effectiveness of the Company's internal controls, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's internal controls, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

2.  Review with the Company's Chief Financial Officer the results of quarterly Disclosure Committee meetings, including, any significant deficiencies in the design and operation of the internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

101.    Finally regarding, "Risks," the Audit Committee Charter charges the Audit Committee with the following:

1.  Periodically review and evaluate the processes utilized by management to identify and assign relative weights to Risks.

2.  Assess the adequacy of management's Risk assessment and mitigation processes.

102.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue a materially false and misleading statement to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations; conduct business in an honest and ethical manner; ensure "full, fair, accurate, timely, and understandable" "public communications[;]" and properly report violations of the Code of Ethics.

103.    In violation of the Audit Committee Charter, Defendants Durenard, Nelson, Murphy, and Serbin (the "Audit Committee Defendants") conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue a materially false and misleading statement to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee the Company's disclosures; monitor

the adequacy and effectiveness of the Company's internal controls; ensure the Company's compliance with legal and regulatory requirements; and review and evaluate the processes utilized by management for identifying, evaluating, and mitigating risks.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

104.    Co-Diagnostics is a Utah-based molecular diagnostics company that was formed to utilize technology invented by Defendant Satterfield, who holds a Biomedical Engineering PhD, to develop and market molecular tools, such as molecular diagnostic tests, for, among other things, the detection of infectious diseases.

105.    On April 28, 2017, Co-Diagnostics filed a Registration Statement on Form S-1 with the SEC, which included a preliminary prospectus (the "2017 Preliminary Prospectus") that disclosed that the Company owned and controlled proprietary technology and a portfolio of intellectual property that allowed it to engineer DNA diagnostic testing at low costs.

106.    The 2017 Preliminary Prospectus stated that, as of 2017, Co-Diagnostics' primary business was the design and sale of diagnostic tests for Zika Virus, Tuberculosis, Hepatitis B, Hepatitis C, Malaria, Dengue Fever, and HIV to customers primarily located in the Caribbean, India, North America, South America, and Central America. However, according to the 2017 Preliminary Prospectus, as of 2017, Co-Diagnostics did not earn significant revenue and did not expect to earn significant revenue in the near future.

107.    The Company disclosed that it expected to obtain regulatory approval to sell tests for Tuberculosis, Hepatitis B, and Hepatitis C in the European Community sometime between 2018 and 2019. However, the 2017 Preliminary Prospectus conceded that the Company did not anticipate offering its tests in the United States in the near future, and that beyond 2019, the

Company did not have a strategy for further research and development. Instead, the Company foresaw its offering diagnostic tests within the United States "based on need and regulatory barriers."

108.    On July 12, 2017, the Company issued a press release announcing the details of its initial public offering. According to the press release, the Company offered 1,178,532 shares[7] of common stock and had been listed on the NASDAQ under ticker symbol "CODX." The Company's shares of common stock had been initially priced at $6.00 per share. Total gross proceeds from the offering equaled $7,071,192.

109.    Thereafter, the price of the Company's stock gradually decreased until it became a "penny stock" beginning in mid-April 2019, at which time Co-Diagnostics' stock intermittently traded at less than $1.00 per share for prolonged intervals until mid-January 2020. For example, on June 24, 2019, the Company's stock closed at $0.71 per share; on November 15, 2019, the Company's stock closed at $0.88 per share; and on January 9, 2020, the Company's stock closed at $0.92 per share.

110.    During this period, Co-Diagnostics was in danger of being delisted from the NASDAQ, as the NASDAQ's continued listing requirements mandate that a company's share price remain equal to or greater than $1.00 per share.

111.    In late 2019, the novel coronavirus, COVID-19, began spreading through Wuhan, China. COVID-19's rampant spread quickly turned into a worldwide pandemic that, to date, has resulted in millions of infections and hundreds of thousands of deaths in the United States, and devastated the global economy and many national healthcare systems.

---

[7] The underwriters had a 45-day option to purchase up to 176,780 additional shares of common stock from Co-Diagnostics.

112. Accurate and reliable methods for mass testing for COVID-19 have become a vitally important tool for containing the outbreak of the virus, as they provide much-needed data to public officials to help determine what public policy measures should be implemented.

113. Given that fast, dependable, and precise diagnostic testing is in extraordinary demand and that DNA-based testing can be effective at detecting COVID-19, Co-Diagnostics was in the fortuitous position to utilize its proprietary technology, intellectual property, and extensive experience in the diagnostic testing space to take advantage of this global public health crisis and financially benefit from the outbreak of the virus.

114. Specifically, Co-Diagnostics developed its COVID-19 test using CoPrimer, which is described on the Company's website as a "leading-edge, patented platform technology" developed by Defendant Satterfield prior to the pandemic that "dramatically enhances the output of molecular diagnostic tests conducted via real-time polymerase chain reaction ('PCR') tests." According to reports, the Company designed its COVID-19 diagnostics test in only about one week.

115. Despite facing intense competition from several life science companies, many of which have substantially greater financial resources and a larger workforce than Co-Diagnostics, on February 24, 2020, the Company announced that it had obtained the "CE" marking; i.e., regulatory approval to sell its COVID-19 tests in the European Community, before any other U.S. company.

116. On this news, the Company's stock price began to surge. In the days leading up to the Company's February 24, 2020 announcement, the Company's stock traded around $3.00 per share. By February 27, 2020, the Company's stock traded as high as $19.00 per share.

117. On February 27, 2020, the Company filed a Form 8-K with the SEC in connection

with the sale and issuance of up to 470,000 shares of the Company's common stock.

118.     The Company also issued a press release on February 27, 2020 announcing a public offering of shares of common stock. With respect to proceeds of the sale, the press release asserted that:

> Co-Diagnostics intends to use the net proceeds from this offering for acquisition of PCR (polymerase chain reaction) equipment and raw materials to be used in connection with sale of tests used to diagnose infectious disease, including strains and mutations of coronavirus, as well as research and development costs associated with test development for additional pathogens and test menu expansion, and for working capital and other general corporate purposes.

119.     On March 2, 2020, the Company issued a press release announcing the closing of its previously announced registered direct offering of 470,000 shares of its common stock.

120.     On March 3, 2020, the Company issued a press release announcing that it had been invited to participate in the 27th Annual Molecular Medicine Tri-Conference. The press release quoted Defendant Egan, who stated, "[i]n the space of about a month, our CoPrimer technology allowed us to design, develop, receive regulatory approval for, and begin marketing detection tools to aid in stemming the tide of this fast-spreading disease."

121.     On or about April 3, 2020, according to an FDA press release,[8] the FDA granted Co-Diagnostics an Emergency Use Authorization for emergency use of its COVID-19 diagnostics tests by certified clinical laboratories in the U.S. for the diagnosis of COVID-19.

122.     Also on April 3, 2020, BioCentury Inc. ("BioCentury") published the results of a study analyzing the limit of detection on COVID-19 diagnostics tests produced by various companies. A higher limit of detection means that a test requires the presence of more virus in order to produce a positive result.

---

[8] As noted herein, the Company issued a press release regarding its Emergency Use Authorization on April 6, 2020.

123.    According to BioCentury, as of April 3, 2020, Co-Diagnostics' test had a higher limit of detection than sixteen competitor tests that were evaluated using the same criteria and only five competitor tests came in below Co-Diagnostics in that category.

124.    According to the Company's SEC filings and press releases as well as public reports, Co-Diagnostics began selling COVID-19 tests to fifty countries and more than twelve states in the U.S. almost immediately after obtaining regulatory certifications. Co-Diagnostics generated millions of dollars in revenue from the sale of its COVID-19 test kits.

125.    For example, through Nomi Health, a Utah-based health care software and data company—which has functioned much like a general contractor in these transactions—Co-Diagnostics entered into a contract worth approximately $5 million to provide COVID-19 tests from March 31, 2020 through May 30, 2020 to the state of Utah. Additionally, through Nomi Health, Co-Diagnostics entered into a contract valued at approximately $26 million to provide approximately 540,000 tests to the state of Iowa over a one-year span ending April 16, 2021.

126.    In light of, among other things, the pressure to maintain the Company's NASDAQ listing and its competitive advantage over more sophisticated competitors, the Individual Defendants rushed the Company's COVID-19 diagnostic tests to market without first competently verifying the accuracy of the tests.

127.    The Individual Defendants knew Co-Diagnostics' tests were less than 100% accurate and knew that the accuracy of the tests had not yet been substantiated at the time the Individual Defendants issued their false claims that the Company's tests were 100% accurate. Additionally, the Individual Defendants knew that a diagnostic test generating accuracy rates between 95% and 99%, for example, would offer significantly less value to public officials working to quickly contain the virus and its devastating effects, as opposed to a diagnostic test

with flawless precision.

128.     In addition to knowing the truth of the underlying test results, Defendant Satterfield

holds a PhD in Bioengineering and Defendant Durenard holds a PhD in Mathematics and has for

years specialized in investing in healthcare companies. Defendant Serbin, too, has made a career

in healthcare, dating back to 1999 at least. Thus, as sophisticated healthcare professionals, they

were particularly knowledgeable as to the realities and limitations of diagnostic testing, even as

they made/and or caused the Company to make a false and misleading statement that successfully

convinced unwitting investors that the Company's tests were far more effective than they were.

129.     Yet, the Individual Defendants intentionally, willfully, recklessly, or with gross

negligence circulated a false statement and omitted material fact regarding the accuracy of the

Company's COVID-19 diagnostic test to the public in order to gain a competitive advantage over

other formidable biotechnology companies and to capitalize on the inimitable financial opportunity

presented by the pandemic. Moreover, they caused the Company to fail to maintain adequate

internal controls.

### **False and Misleading Statement**

#### *May 1, 2020 Press Release*

130.     On May 1, 2020, Co-Diagnostics issued a press release titled: "Co-Diagnostics, Inc.

Releases COVID-19 Test Performance Data: Consistently ***Demonstrates 100% Sensitivity and***

***100% Specificity Across Independent Evaluations***." (Emphasis added.) In the press release, the

Company stated, in relevant part:

> Co-Diagnostics, Inc. (Nasdaq: CODX) (the Company), a molecular diagnostics
> company with a unique, patented platform for the development of diagnostic tests,
> today released COVID-19 test performance data demonstrating ***100% sensitivity***
> ***and 100% specificity***, ***the metrics used to determine accuracy in molecular***
> ***diagnostics testing***.

32

> The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations were conducted in Mexico by the Mexican Department of Epidemiology ("InDRE"), India, and elsewhere in the US and abroad. ***Each study concluded 100% concordance for both specificity and sensitivity***.

(Emphasis added.)

131.    The press release then stated the following, attributing a statement to Defendant Satterfield:

> In remarking on the test's favorable limit of detection (LOD) results in the evaluations, ***Brent Satterfield, PhD said***, "In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a standalone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, ***we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that.***"

(Emphasis added.)

132.    The statements and omissions referenced in ¶¶ 130–31 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company's COVID-19 tests were not 100% accurate; (2) the commercial viability of the Company was overstated in light of the true accuracy and efficacy of the Company's COVID-19 tests; and (3) the Company failed to maintain internal controls. Due to the foregoing, the Individual Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

133.    However, the public accepted the press release as true. *Investor's Business Daily* reported in a May 1, 2020 online article that "Co-Diagnostics (CODX) said Friday its coronavirus test has proven 100% accurate in field testing — leading CODX stock to rocket."[9]

---

[9] https://www.investors.com/news/technology/codx-stock-soars-coronavirus-test-proves-

134.    That same day, May 1, 2020, the investor news website *Proactive* published an article titled "Co-Diagnostics says coronavirus test shows spotless sensitivity data in independent evaluations" which began by noting that Co-Diagnostics had "released performance data for its coronavirus (COVID-19) diagnostic test on Friday that showed 100% sensitivity and 100% specificity, the two metrics used to measure accuracy in molecular diagnostic testing."[10]

135.    Likewise, on May 11, 2020, *InvestorPlace* published an article titled: "Co-Diagnostics Is a Smart Way to Play Coronavirus Testing: The company's tests are reportedly 100% accurate in at least three countries[.]"[11]

### The Truth Emerges

136.    However, soon reputable third parties with significant public platforms began to uncover and reveal alarming information about the true accuracy of Co-Diagnostics' COVID-19 tests.

#### May 13, 2020 The Gazette Article

137.    On May 13, 2020, *The Gazette*, a Cedar Rapids, Iowa newspaper, published an article questioning the "integrity" of Co-Diagnostic's test after seeing 1–2% of tests used by TestIowa—an Iowa-based COVID-19 testing initiative—come back "inconclusive."

#### May 14, 2020 Salt Lake Tribune Article

138.    One day later, on May 14, 2020, the *Salt Lake Tribune* (the "*Tribune*") reported that TestUtah.com "declined to join other major Utah labs in a joint experiment to confirm one another's quality." Moreover, the *Tribune* revealed that the Co-Diagnostics' tests used by TestUtah

---

accurate/

[10] https://www.proactiveinvestors.com/companies/news/918662/co-diagnostics-says-coronavirus-test-shows-spotless-sensitivity-data-in-independent-evaluations-918662.html

[11] https://investorplace.com/2020/05/co-diagnostics-codx-stock-smart-coronavirus-play/

"have a higher 'limit of detection'—that is, they require more of the virus to trigger a positive result—than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury." In other words, it was likely that Co-Diagnostics' tests had a much higher false negative reporting rate. As a result, potentially thousands of infected people were erroneously told that they did not have COVID-19.

139.    The article also noted that Co-Diagnostics' tests were used by TestIowa as well as TestNebraska.

### May 14, 2020 Governor Reynolds Statement

140.    Also on May 14, 2020, Iowa Governor Kim Reynolds issued a public statement, declaring: "I'm pleased to announce that the State Hygienic Lab completed the TestIowa validation process yesterday, achieving high ratings of *95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives.*" (Emphasis added.)

141.    TestIowa's reported results undeniably contradicted previous statements made by Co-Diagnostics and the Individual Defendants regarding the accuracy of the Company's COVID-19 test.

142.    Defendant Satterfield would later admit in a June 13, 2020 article in the *New Yorker* magazine that the announcement of lower positive rates for the Company's tests "has certainly got all of us scratching our heads a bit."

### May 14, 2020 Earnings Conference Call

143.    As chance would have it, the Company held an earnings call with investors and analysts that day, May 14, 2020. The developing disclosures were not addressed on the call, with Company representatives instead emphasizing that the Company had turned profitable for the first time in seven years.

144. *The Gazette*, which was covering the call, described the call as "more like Thanksgiving with drunk uncles — dogs were barking, people were swearing, and someone was moaning." *The Gazette* continued that: "None of Co-Diagnostics or Nomi Health's news releases about the Logix Smart tests [i.e., the brand name of Co-Diagnostics' tests] have revealed how many tests have been sold, for how much, and so far all three testing initiatives in Iowa, Nebraska and Utah have been secretive about the tests and the results."

### May 14, 2020 FDA Press Release

145. Finally, on May 14, 2020, the FDA issued a press release "in the spirit of transparency" to inform the public of another company's struggle to develop an accurate diagnostic test for COVID-19. The FDA's press release stated, in relevant part, that:

> The FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test. ***No diagnostic test will be 100% accurate*** due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly.

(Emphasis added.)

146. Based on the release of all this third-party information that demonstrated the falsity of Co-Diagnostics' claims of 100% accuracy, the Company's stock price began to fall, closing at $22.13 per share on May 14, 2020, after hitting an intraday low of $18.35 per share. The Company's stock price further fell to close at $17.07 per share on May 15, 2020, representing a loss in value of approximately 22.9% from the prior day's closing price.

### May 20, 2020 Motley Fool Article

147. On May 20, 2020, the *Motley Fool* published an article titled "Is Co-Diagnostics' Stock in a Bubble?" challenging the Company's purportedly 100% accurate COVID-19 test. The article explained why exactly even slight deviations in percentages could render tests dramatically

36

less useful, stating in relevant part:

> *In May, Co-Diagnostics announced its COVID-19 in vitro test had been found to have 100% accuracy, 100% specificity (likelihood of preventing a false-negative error), and 100% sensitivity (likelihood of preventing a false-positive error)*, as per independent verification in laboratories across the world.

*          *          *

The devil is in the details

To start off, ***Co-Diagnostics came to the conclusion that its test was 100% effective on all three diagnostic dimensions (specificity, accuracy, and sensitivity) based on studies with small sample sizes***. For example, laboratory testing of the Logix test kit conducted in Australia involved about 100 COVID-19-positive patients and 100 COVID-19-negative patients. With a sample size that small, a low error rate, say 1% to 2%, could be really hard to detect. In fact, the study itself explicitly stated that the test could in fact be between 96% to 98% effective, rather than 100%.

In addition, the testing environment is by no means indicative of the actual prevalence of COVID-19 in the population at this point in the pandemic. Among the test samples, 50% contained SARS-CoV-2, and obviously, at this point, nowhere near half the people in the world have been exposed to the coronavirus. ***"But wait a minute!" the intelligent reader might say. "Nothing in the world is perfect, so who cares if a test's results are off by 1% or 3%? Effectiveness of 97% is still nothing short of an A-plus. You're just being a devil's advocate, Zhiyuan!" Unfortunately, this is one of the cases where it is critical to pay attention to the devil in the details. In fact, a 1% or 3% error rate can render a in vitro test almost useless.*** Here's why.

***Let us assume, for the sake of argument, the true sensitivity of Logix is 98%, and its true specificity is also 98%. In other words, the probability of the test delivering a false positive is 2%, and the probability of the test returning a false negative is also 2%.*** Both of these values are directly stated as being probable in studies citing Logix's range of effectiveness, and they are valid assumptions given that the test has not been fully vetted by the FDA or other regulators. It is also common knowledge that because there are not enough viral tests for the COVID-19, the number of people who have the virus is likely to be significantly higher than official figures. For example, ***it is estimated that up to 4.1% of the residents of Los Angeles County have COVID-19 antibodies.*** Let's use that 4.1% figure in our calculations as a measure of prevalence of COVID-19 (a lower prevalence would hurt the test even more). ***Assuming 1 million people are given the Logix test, 41,000 should test positive*** for an ongoing SARS-CoV-2 infection. ***However, if the test provides a false negative 2% of the time, only 98% of those 41,000 -- 40,180 -- would show up as positives.***

37

***On the other hand, out of the 959,000 people who were actually negative for the virus, a 2% error rate would yield 19,180 cases of false positives*** -- individuals who don't have the disease despite the test saying they do. All told, ***that makes 59,360 people getting positive results, but only 40,180 of them would actually be positive. That yields a predictive value of 67.7%.***

In other words, ***if the Logix test only works as well as it does in this scenario -- and it's right 98% of the time -- there's still a 1-in-3 chance that the test will indicate you have COVID-19 even though you don't!*** As one can see, a 32.3% false-positive error rate isn't very good at all. This problem gets worse if we assume the same prevalence, but lower Logix's potential sensitivity and specificity estimates to 95% for both. In this scenario, the probability of getting a false positive increases to 55.2%! While the results are surprising, they nonetheless use the basics of conditional probability; here is a calculator in case you want to try it out for yourself. Furthermore, a recent New York University study on COVID-19 in vitro tests developed by Abbott Laboratories (NYSE: ABT) found them to be widely inaccurate and unacceptable for use in patients. Keep in mind, those tests were also promoted as having 100% sensitivity and 99.9% specificity in earlier investigations. Unfortunately, this just serves to highlight how difficult it is to develop an accurate test for diseases with a low rate of prevalence like COVID-19.

(Emphasis added.)

## DAMAGES TO CO-DIAGNOSTICS

148.    As a direct and proximate result of the Individual Defendants' conduct, Co-Diagnostics will lose and expend many millions of dollars.

149.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and each of the Individual Defendants, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

150.    These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

151.    Additionally, the Company experienced losses attributable to, but not limited to, any lost business the Company experienced as its current and prospective customers discovered

that Co-Diagnostics' tests were not as accurate as stated.

152.   As a direct and proximate result of the Individual Defendants' conduct, Co-Diagnostics has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and other violations of law.

## DERIVATIVE ALLEGATIONS

153.   Plaintiffs bring this action derivatively and for the benefit of Co-Diagnostics to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Co-Diagnostics, unjust enrichment, waste of corporate assets, and violations of the Exchange Act.

154.   Co-Diagnostics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

155.   Plaintiffs are, and have been at all relevant times, shareholders of Co-Diagnostics. Plaintiffs will adequately and fairly represent the interests of Co-Diagnostics in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

156.   Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

157.   A pre-suit demand on the Board of Co-Diagnostics is futile and, therefore, excused. At the time of filing of this Complaint, the Board consists of the following five individuals:

Defendants Egan, Durenard, Murphy, Nelson, and Serbin (the "Directors").[12] Plaintiffs need only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

158.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in intentionally, willfully, knowingly, recklessly, or with gross negligence to make and/or cause the Company to make the false and misleading statements and omissions of material facts at issue, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

159.    In complete abdication of their fiduciary duties, the Directors intentionally, willfully, knowingly, recklessly, or with gross negligence participated in making and/or causing the Company to make the materially false and misleading statements and omissions alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

160.    The Directors knew of the falsity of the misleading statements at the time they were made. The development and commercialization of COVID-19 tests comprised the core operations of Co-Diagnostics during the Relevant Period. The accuracy of the COVID-19 tests was highly material to the Company's core operations, which is reflected in the Company' meteoric stock price increase following the announcement that the Company's tests were receiving regulatory

---

[12] If instead demand futility is analyzed at the time this action was commenced, the analysis is the same given that the composition of the Board at that time was the same.

approval. This is further made clear by the Company's May 1, 2020 press release and by the Company's May 14, 2020 earnings call in which the Company disclosed that—riding the short-lived tailwinds of its supposedly flawless tests—it had finally achieved profitability.

161.    As Board members of Co-Diagnostics charged with overseeing the Company's affairs, the Directors all had knowledge and information—or were reckless or grossly negligent in being unaware of such knowledge and information—pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Co-Diagnostics, the Directors must have been aware, or were highly reckless or grossly negligent in not being aware, of the material facts surrounding the accuracy of the COVID-19 tests described herein, including the revelations brought to light by third-parties, including, but not limited to, the *Tribune*, *The Gazette*, the FDA, and Governor Reynolds, and acknowledged by the Company's founder and former CSO, Defendant Satterfield.

162.    This inference of actual knowledge of the falsity of the misleading statements and omissions at issue is further supported by the sophistication of the Company's Directors and its CSO. As mentioned, Defendant Durenard holds a PhD in Mathematics and has for years specialized in investing in healthcare companies. Defendant Serbin, too, has made a career in healthcare, dating back to 1999 at least. Defendant Satterfield holds a PhD in Bioengineering, and at all times the Directors had reasonable access to him, including at the time he made the false and misleading statement at issue on May 1, 2020. Thus, as sophisticated healthcare professionals, the Directors—particularly Defendants Durenard and Serbin—were knowledgeable as to the realities and limitations of diagnostic testing, even as they made/and or caused the Company to make a false and misleading statement that successfully convinced unwitting investors that the Company's tests were far more effective than they were.

163.    Moreover, and as described above, Defendants Durenard, Egan, Nelson, and Serbin—i.e., four of five Directors—have engaged in lucrative insider sales even as the Company's common stock continues to decline, further evidencing their knowledge that the Company's tests were not as accurate as described, and providing them with a motive to participate in the scheme.

164.    Therefore, the Directors each knew, or were highly reckless or grossly negligent in not knowing, of the falsity of the statement and misleading omissions detailed herein at the time such statement was made, and further failed to ensure that the Company maintained adequate internal controls to prevent dissemination of the same.

165.    Additional reasons that demand on Defendant Egan is futile follow. Defendant Egan has served as a Company director since April 2013 and serves as Chairman of the Board. He also serves as the Company's CEO and President, and is thus, as the Company admits, a non-independent director. He receives handsome compensation from the Company, including $1,463,625 in the fiscal year ended December 31, 2020. As CEO, Defendant Egan was ultimately responsible for the false and misleading statements and omissions that were made in the May 1, 2020 press release. As Chairman of the Board, CEO, and President, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Egan is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability particularly given that the Court has recently denied a motion to dismiss in that case. For these reasons, too, Defendant Egan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and,

42

therefore, excused.

166.    Additional reasons that demand on Defendant Durenard is futile follow. Defendant Durenard has served as a Company director since June 2019 and serves as Chair of the Audit Committee in addition to serving as a member of the Compensation Committee and the Corporate Governance and Nominating Committee. He has received and continues to receive compensation from the Company for his role on the Board, including $229,900 in the fiscal year ended December 31, 2020. He sold approximately $916,000 of Company common stock in May 2020 as the fraud began emerging. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Durenard is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability particularly given that the Court has recently denied a motion to dismiss in that case. For these reasons, too, Defendant Durenard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy has served as a Company director since June 2019 and serves as a member of the Audit Committee in addition to being a member of the Compensation Committee and the Corporate Governance and Nominating Committee. He has received and continues to receive compensation from the Company for his role on the Board, including $106,000 in the fiscal year ended December 31, 2020. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Murphy is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability particularly given that the Court has recently denied a motion to dismiss in that case. For these reasons, too, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Nelson is futile follow. Defendant Nelson has served as a Company director since August 2019. He also serves as a member of the Audit Committee, as the Chair of the Corporate Governance and Nominating Committee, and as a member the Compensation Committee. He has received and continues to receive compensation from the Company for his role on the Board, including $125,000 in the fiscal year ended December 31, 2020. As a trusted Company director and a member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Nelson is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability particularly given that the Court has recently denied a motion to dismiss in that case. For these reasons, too, Defendant Nelson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Serbin is futile follow. Defendant Serbin has served as a Company director since May 2017 and serves as a member of the Audit

Committee as well as serving as Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. He has received and continues to receive compensation from the Company for his role on the Board, including $316,830 in the fiscal year ended December 31, 2020. He sold approximately $913,000 of Company common stock in May 2020 as the fraud began emerging. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Serbin is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability particularly given that the Court has recently denied a motion to dismiss in that case. For these reasons, too, Defendant Serbin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on the Board is futile follow.

171.    All of the Directors breached the duty of candor by intentionally, willfully, recklessly, or with gross negligence making, or causing the Company to make, false and misleading statements or omissions of fact regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Directors may not be indemnified for breaching the duty of candor. As a result, all of the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

172.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue a materially false

and misleading statement to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Directors failed to comply with laws and regulations; conduct business in an honest and ethical manner; ensure "full, fair, accurate, timely, and understandable" "public communications[;]" and properly report violations of the Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

173.    In violation of the Audit Committee Charter, the Audit Committee Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue a materially false and misleading statement to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee the Company's disclosures; monitor the adequacy and effectiveness of the Company's internal controls; ensure the Company's compliance with legal and regulatory requirements; and review and evaluate the processes utilized by management for identifying, evaluating, and mitigating risks. Thus, the Audit Committee Defendants face a substantial likelihood of liability and demand is futile as to them.

174.    Co-Diagnostics has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Co-Diagnostics any part of the damages Co-Diagnostics suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

175.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, grossly negligent, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

176.    The acts complained of herein constitute violations of fiduciary duties owed by Co-Diagnostics' officers and directors, and these acts are incapable of ratification.

177.    The Directors may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Co-Diagnostics. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Co-Diagnostics, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

178.    If there is no directors' and officers' liability insurance, then the Directors will not

cause Co-Diagnostics to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

179.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

180.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

181.     Section 16-10a-840(1) of the Utah Revised Business Corporation Act (the "URBCA"), provides that "Each director shall discharge the director's duties as a director, including duties as a member of a committee, and each officer with discretionary authority shall discharge the officer's duties under that authority: (a) in good faith; (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) in a manner the director or officer reasonably believes to be in the best interest of the corporation."

182.     Section 16-10a-840(4) of the URBCA, provides that "A director or officer is not liable to the corporation [or] its shareholders … for any action taken, or any failure to take any action, as an officer or director, as the case may be, unless: (a) the director or officer has breached or failed to perform the duties of the office in compliance with this section; and (b) the breach or failure to perform constitutes gross negligence, willful misconduct, or intentional infliction of harm on the corporation or the shareholders."

183.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Co-Diagnostics' business and affairs.

184.   Each of the Individual Defendants violated and breached his fiduciary duties of loyalty, good faith, and due care, which constituted intentional infliction of harm on the Company, willful misconduct, or gross negligence, causing damage to the Company and its shareholders, including Plaintiffs, by wrongdoing that includes failing to reasonably inform themselves and consciously disregarding the best interests of the Company, failing to properly oversee the Company's operations, and failing to inform the Company and its shareholder about the wrongdoing alleged herein.

185.   The Individual Defendants' conduct set forth herein was due to their intentional, willful, reckless, or grossly negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, willfully, recklessly, or with gross negligence breached or disregarded their fiduciary duties to protect the rights and interests of Co-Diagnostics.

186.   In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

187.   In further breach of their fiduciary duties owed to Co-Diagnostics, the Individual Defendants intentionally, willfully, recklessly, or with gross negligence made and/or caused the Company to make a false and misleading statement and omissions of material fact that failed to disclose that: (1) the Company's COVID-19 tests were less than 100% accurate; (2) the commercial viability of the Company was overstated in light of the true accuracy and efficacy of the Company's COVID-19 tests; and (3) the Company failed to maintain internal controls. Due to the foregoing, the Individual Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

188.     The Individual Defendants had actual or constructive knowledge that the Company issued materially a false and misleading statement. The Individual Defendants had actual knowledge of the misrepresentation and omissions of material facts set forth herein, or acted with reckless disregard or carelessness to a degree that showed utter indifference for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were reasonably available to them. Such material misrepresentations and omissions were committed intentionally, willfully, knowingly, recklessly, or with gross negligence and for the purpose and effect of artificially inflating the price of Co-Diagnostics' securities.

189.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard or carelessness to a degree that showed utter indifference for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were reasonably available to them. Such improper conduct was committed intentionally, willfully, knowingly, recklessly, or with gross negligence and for the purpose and effect of artificially inflating the price of Co-Diagnostics' securities.

190.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

191.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Co-Diagnostics has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.    The misconduct alleged herein demonstrates that the Individual Defendants failed to discharge their fiduciary duties to the Company in good faith, with the care of an ordinarily prudent person in a like position under similar circumstances, and in a manner the Individual Defendants reasonably believed to be in the best interests of the Company.

193.    Plaintiffs on behalf of Co-Diagnostics have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

194.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

195.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Co-Diagnostics.

196.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Co-Diagnostics that was tied to the performance or artificially inflated valuation of Co-Diagnostics, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

197.    Plaintiffs, as shareholders and representatives of Co-Diagnostics, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

198.    Plaintiffs on behalf of Co-Diagnostics have no adequate remedy at law.

## THIRD CLAIM

199.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

200.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

201.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

202.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

203.     Plaintiffs on behalf of Co-Diagnostics have no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

204.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

205.     Co-Diagnostics, and each of the Individual Defendants, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. The Company's liability in the Securities Class Action will be in whole or in part due to the Individual

Defendants' willful and/or reckless violations of their obligations as officers and/or directors of Co-Diagnostics.

206.     The Individual Defendants, because of their positions of control and authority as officer and/or directors of Co-Diagnostics, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Co-Diagnostics, including the wrongful acts complained of herein and in the Securities Class Action.

207.     Accordingly, the Individual Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

208.     As such, Co-Diagnostics is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of Co-Diagnostics, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Co-Diagnostics;

(c)     Determining and awarding to Co-Diagnostics the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Co-Diagnostics and the Individual Defendants to take all

necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Co-Diagnostics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Co-Diagnostics to nominate at least three candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e)    Awarding Co-Diagnostics restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

Dated this 3rd day of May, 2022.

Respectfully submitted,

**ANDERSON & KARRENBERG**

By:     /s/ Jared D. Scott
Jared D. Scott, Esq.
50 West Broadway, Suite 700
Salt Lake City, UT 84101
Email: jscott@aklawfirm.com

*Liaison Counsel for plaintiffs*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Tel: (212) 983-1300
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*

## **VERIFICATION**

I, Luis Aguilera, am a plaintiff in the within action.  I have reviewed the allegations made in this Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of April, 2022.

4/13/2022

Luis Aguilera